1   MICHAEL L. MAU, ESQ. (Bar No. 169355)
    THE MAU LAW FIRM aka Law Offices of Michael L. Mau
2   950 HARRISON STREET, STE. 213
    SAN FRANCISCO, CA  94107-1078
3   (415) 495-8082
    (415) 495-8084 (fax)
4   maulawsf@hotmail.com

5   Attorneys for Use-Plaintiff
    George E. Masker, Inc.

6

7

8                   UNITED STATES DISTRICT COURT

9                 NORTHERN DISTRICT OF CALIFORNIA

10                    SAN FRANCISCO DIVISION

11

12   UNITED STATES OF AMERICA for the use        )   Case No.:
     and benefit of GEORGE E. MASKER, INC., a    )
13   California corporation,                      )   COMPLAINT FOR RECOVERY ON MILLER
                                                  )   ACT PAYMENT BOND; MONIES DUE;
14                      Plaintiff,                )   QUANTUM MERUIT;  BREACH OF
                                                  )   CONTRACT;  ACCOUNT STATED / BOOK
15           vs.                                  )   ACCOUNT.
                                                  )   (40 USC § 3131, et seq.)
16   AMERICAN CASUALTY COMPANY OF                 )
     READING, PA, a surety;  CONTINENTAL         )
17   CASUALTY COMPANY, a surety;                  )   DEMAND FOR JURY TRIAL
     NATIONAL UNION FIRE INSURANCE                )
18   COMPANY OF PITTSBURGH, PA, a surety;         )
     DICK / MORGANTI / NIBBI, J.V., a joint       )
19   venture;  DICK CORPORATION, a corporation;  )
     THE MORGANTI GROUP, INC., a corporation;     )
20   NIBBI BROTHERS CONSTRUCTION, a joint         )
     venture;  NIBBI BROTHERS, INC., a            )
21   corporation;  NIBBI BROTHERS                 )
     ASSOCIATES, INC., a corporation;  and DOES   )
22   1-100, inclusive,                             )
                                                  )
23                      Defendants.               )
     _____    )

24

25           Use-Plaintiff George E. Masker, Inc. complains and alleges as follows:

                                      -1-

              COMPLAINT FOR RECOVERY ON MILLER ACT PAYMENT BOND, etc.

PARTIES

1.     Use-Plaintiff, George E. Masker Inc. ("Masker"), was, and at all times material hereto, is, a California corporation, organized and existing under and by virtue of the laws of the State of California, and was and is, a duly licensed California contractor, in the conduct of business in San Francisco County, California.

2.     Defendant American Casualty Company of Reading, PA, was, and at all times material hereto, is, a surety, licensed to do business in California, and is authorized to engage in, and actually does engage in, the business of making, guaranteeing and becoming a surety on bonds and undertakings required or authorized by law.

3.     Defendant Continental Casualty Company, was, and at all times material hereto, is, a surety, licensed to do business in California, and is authorized to engage in, and actually does engage in, the business of making, guaranteeing and becoming a surety on bonds and undertakings required or authorized by law.

4.     Defendant National Union Fire Insurance Company of Pittsburgh, PA, was, and at all times material hereto, is, a surety, licensed to do business in California, and is authorized to engage in, and actually does engage in, the business of making, guaranteeing and becoming a surety on bonds and undertakings required or authorized by law.

5.     Defendant Dick / Morganti / Nibbi, J.V. was, and at all times material hereto, is, a joint venture, and licensed general contractor, residing and in the conduct of business in San Francisco County, California, comprised of defendants Dick Corporation, The Morganti Group, Inc. and Nibbi Brothers Construction, as Joint Venturers, partners, owners and guarantors of the Joint Venture, and licensed general contractor, formed in the State of California, residing and in the conduct of business in San Francisco County, California.

6.     Defendant Dick Corporation was, and at all times material hereto, is, a corporation and licensed general contractor, was and is one of the Joint Venturers, partners and guarantors of defendant Dick / Morganti / Nibbi, J.V. with joint and several liability thereto, and is in the conduct of business in San Francisco, California.

7.     Defendant The Morganti Group, Inc. was, and at all times material hereto, is, a corporation and licensed general contractor, was and is one of the Joint Venturers,

-2-

COMPLAINT FOR RECOVERY ON MILLER ACT PAYMENT BOND, etc.

partners and guarantors of defendant Dick / Morganti / Nibbi, J.V. with joint and several liability thereto, and is in the conduct of business in San Francisco, California.

8.    Defendant Nibbi Brothers Construction, was, and at all times material hereto, is, a joint venture, and licensed general contractor, and it was and is one of the Joint Venturers, partners and guarantors of defendant Dick / Morganti / Nibbi, J.V. with joint and several liability thereto, and is in the conduct of business in San Francisco, California.

9.    Defendant Nibbi Brothers, Inc., was, and at all times material hereto, is, a California corporation, and licensed general contractor, and it was and is one of the joint venturers, partners and guarantors of defendant Nibbi Brothers Construction, which itself is a Joint Venturer, partner and guarantor of defendant Dick / Morganti / Nibbi, J.V. with joint and several liability thereto, and is in the conduct of business in San Francisco, California.

10.    Defendant Nibbi Brothers Associates, Inc., was, and at all times material hereto, is, a California corporation, and licensed general contractor, and it was and is one of the joint venturers, partners and guarantors of defendant Nibbi Brothers Construction, which itself is a Joint Venturer, partner and guarantor of defendant Dick / Morganti / Nibbi, J.V. with joint and several liability thereto, and is in the conduct of business in San Francisco, California.

11.    Hereinafter, defendants Dick Corporation, The Morganti Group, Nibbi Brothers Construction, Nibbi Brothers, Inc., Nibbi Brothers Associates, Inc., and Dick / Morganti / Nibbi, J.V. and each of them, were and are Joint Venturers, agents, affiliates, partners, owners, members, shareholders, successors and assigns, of each other, and are collectively referred to as defendants "D/M/N".

12.    Use-Plaintiff is ignorant of the true names and capacities of defendants sued herein as Does 1 through 100, inclusive, and therefore sues these defendants by such fictitious names. Use-Plaintiff will amend this complaint to allege their true names and capacities when ascertained.

13.    Use-Plaintiff is informed and believes and thereon alleges that at all times mentioned herein, the defendants, and each of them, were, the agents, and employees of each of the remaining defendants, and each, was acting within the purpose and scope of said agency

COMPLAINT FOR RECOVERY ON MILLER ACT PAYMENT BOND, etc.

1    and appointment.

2    <u>JURISDICTION AND VENUE</u>

3    14.    This is an action brought under the Miller Act, 40 USC § 3131, et seq., where this Court

4    has original jurisdiction and is the proper venue for this action.  As an ancillary matter,

5    this Court would also have original diversity jurisdiction under 28 USC § 1332, et seq., as

6    it is between citizens of different states and the matter in controversy exceeds $75,000.00,

7    exclusive of interest, fees and costs.  This Court also has ancillary and supplemental

8    jurisdiction under 28 USC § 1367, et seq., because the claims and anticipated

9    counterclaims derive from a common nucleus of operative facts and are so closely related

    to the claims at issue that they form part of the same controversy.

10   15.    Venue is proper in this juridical district and this Court under 40 USC 3133(b)(3), and also

11   pursuant to 28 USC § 1391(a)(1)(2) and/or (3), et seq.

12   <u>INTRADISTRICT ASSIGNMENT</u>

13   16.    Pursuant to Rule 3-5(b) of the Civil Local Rules for the United States District Court for

14   the Northern District of California, this actions should be assigned to the San Francisco

15   Headquarters / Division on the basis that this is a civil action affecting property and/or

    where the claims arose in the City and County of San Francisco.

16   <u>GENERAL FACTS</u>

17   17.    On information and belief, the United States of America General Services Administration

18   ("GSA")  is the owner of the construction work of improvement commonly known as the

19   new Federal Office Building, located 1000 Mission Street, San Francisco, CA

    ("Project").

20   18.    On information and belief, defendants D/M/N were retained by GSA, as the general

21   contractor pursuant to a written prime / general contract, for the construction of the

22   Project.

23   19.    Defendants D/M/N in turn retained, Use-Plaintiff MASKER as a subcontractor for the

24   Project for work including but not limited to, painting preparation, painting, finishing and

25   related construction work.

COMPLAINT FOR RECOVERY ON MILLER ACT PAYMENT BOND, etc.

FIRST CAUSE OF ACTION
(Action on Miller Act Payment Bond)
(Against all defendants and unnamed Does)

Use-Plaintiff refers to and incorporates herein each of the foregoing paragraphs.

20.    This action is brought pursuant to and jurisdiction is conferred by Title 40, United States Code, Section 3131, et seq.

21.    On or about January 25, 2002, defendant D/M/N was awarded a contract by the United States of America, General Services Administration for the new Federal Office Building Project as alleged above ("Prime Contract"), under solicitation number and contract number GS-09P-02-KTC-0002.

22.    On or about August 13, 2002 and again on March 6, 2003, pursuant to 40 USC Section 3131, et seq., defendant D/M/N as principal and defendants American Casualty Company of Reading, PA, Continental Casualty Company, and National Union Fire Insurance Company of Pittsburgh, PA , as sureties, executed and delivered a certain Miller Act payment bond to the United States of America GSA, in the penal sums of $35,692,000.07, $69,761,265.22, and $28,103,652.78, respectively, whereby said defendants bound themselves jointly and severally and guaranteeing the payment to all person supplying labor and materials in the prosecution of the work provided for in said Prime Contract and any and all duly authorized modifications thereof up to the amount of the Prime Contract price and sum of said bonds.  Which said bond was executed and delivered as aforesaid in accordance with the provisions of an act of the legislature of the United States of America dated August 24, 1935, 49 Stat. 793, as amended (40 USC §3131, et seq., and a true copy of said bond is attached hereto, is incorporated herein by reference, and is marked as **Exhibit 1**, subject to modification and further proof at trial.

23.    During the course of the performance and prosecution of said work and pursuant to the written subcontract agreement, Use-Plaintiff sold, delivered, performed and provided certain labor, materials and equipment to defendants at their special instance and request, which said labor, materials and equipment were furnished to be used in the prosecution of the work provided for in said Contract and Project, as described herein.

-5-

COMPLAINT FOR RECOVERY ON MILLER ACT PAYMENT BOND, etc.

24. Said labor, materials and equipment furnished by Use-Plaintiff in the prosecution of said work as aforesaid were and reasonably are worth the sum of $1,397,309, of which the current amount past due, owing and unpaid to Use-Plaintiff is the sum of $194,336.00 after deducting all just credits and offsets and the same has not been paid, neither the whole nor any part thereof.

25. Use-Plaintiff last furnished labor, material, services and equipment to the Project within the year immediately preceding the date this complaint was filed, and a period of 90 days has now elapsed since Use-Plaintiff last provided same.

26. Although demand therefore has been made, D/M/N and its sureties have failed, neglected and refused to pay the amount due to Use-Plaintiff for the services, materials and equipment furnished on the Project in the amount of $194,336.00, plus statutory penalties, interest, attorneys' fees and costs thereon.  Use-Plaintiff is an express and implied beneficiary under the referenced bond terms.

WHEREFORE, Use-Plaintiff prays for judgment as hereinafter set forth.

<u>SECOND CAUSE OF ACTION</u>
(Monies Due)
(Against defendants D/M/N and unnamed Does)

Use-Plaintiff refers to and incorporates as though fully set forth herein each of the foregoing paragraphs.

27. Within the last two years defendants D/M/N became indebted to Use-Plaintiff Masker in the agreed sum of $194,336.00 for materials, equipment and services rendered by Use-Plaintiff to defendants, and each of them, at their special instance and request.

28. Neither the whole nor any part of the above sum has been paid, even though Use-Plaintiff has demanded payment, and there is now due, owing and unpaid from defendants, and each of them, to Use-Plaintiff, the sum of $194,336.00 together with interest thereon at the prevailing legal rate.

WHEREFORE, Use-Plaintiff prays for judgment as hereinafter set forth.

/ /

/ /

COMPLAINT FOR RECOVERY ON MILLER ACT PAYMENT BOND, etc.

### THIRD CAUSE OF ACTION
(Quantum Meruit)
(Against defendants D/M/N and unnamed Does)

Use-Plaintiff refers to and incorporates as though fully set forth herein each of the foregoing paragraphs.

29.    Within the last two years, in San Francisco County, California, Use-Plaintiff Masker has rendered materials, equipment and services to defendants D/M/N at their special instance and request for which defendants then and there agreed to pay to Use-Plaintiff the reasonable value of such materials and services.

30.    At all times mentioned herein, the reasonable value of such services, materials and equipment was, and is, the sum of $194,336.00 of which the same total principal amount remains due and owing by defendants to Use-Plaintiff.

WHEREFORE, Use-Plaintiff prays for judgment as hereinafter set forth.

### FOURTH CAUSE OF ACTION
(Breach of Contract)
(Against defendants D/M/N and unnamed Does)

Use-Plaintiff refers to and incorporates as though fully set forth herein each of the foregoing paragraphs.

31.    Within the last two years, defendants D/M/N entered into a written subcontract with Use-Plaintiff Masker, and payment agreement, (referred to jointly as "Contract") for painting preparation, painting, finishing and related construction work, wherein Use-Plaintiff would provide, and therein did provide, said materials, equipment and services to defendants, for a work of improvement commonly known as the new Federal Office Building, located 1000 Mission Street, San Francisco, CA ("Project"), under the direction of GSA as Owner.  Attached and incorporated herein as **Exhibit 2** is a true and correct copy of the Contract, subject to modification and further proof at trial.

32.    During the course of Use-Plaintiff's performance, defendants breached the Contract by, without limitation:

    1.    failing to make timely payment, and failing to make total payment under the Contract, to Use-Plaintiff, for the materials, equipment and services provided;

    2.    withholding payment for extra work performed at the Project, after providing

-7-

COMPLAINT FOR RECOVERY ON MILLER ACT PAYMENT BOND, etc.

written confirmation that said extra work was to be performed and would thereby be compensated;

33. Pursuant to the terms of the Contract, Use-Plaintiff provided all necessary equipment and services for performance of the Contract, in accordance with the plans, specifications and schedule of the Project, and performed all other conditions, covenants and promises under the Contract, except those conditions, covenants and promises which it was prevented from performing by defendants, the performance of which are thereby excused.

34. As a direct and proximate result of defendants' breaches of the Contract, Use-Plaintiff has incurred damages in the principal amount of $194,336.00, plus interest from on or about September 1, 2007, and such further amounts according to proof at trial. In accordance with the terms of the Contract, Use-Plaintiff is entitled to recover its actual attorneys' fees and costs incurred in relation to this action, according to proof.

35. In accordance with California law, including but not limited to Public Contracts Code Section 10262.5, and Business & Professions Code Section 7108.5, Use-Plaintiff is entitled to recover a 2% per month penalty on the unpaid principal balance, and its attorneys' fees and costs.

WHEREFORE, Use-Plaintiff prays for judgment as hereinafter set forth.

### FIFTH CAUSE OF ACTION
(Account Stated / Book Account)
(Against defendants D/M/N and unnamed Does)

Use-Plaintiff refers to and incorporates as though fully set forth herein each of the foregoing paragraphs.

36. Within the last two years, in San Francisco County, California, an account was stated in writing by and between Use-Plaintiff Masker and defendants D/M/N, and each of them, and on such account the balance of $194,336.00 was found to be due to Use-Plaintiff, and each of them. Defendants, and each of them, agreed to pay Use-Plaintiff this balance.

37. Although demanded by Use-Plaintiff from defendants, and each of them, no part of the agreed balance has been paid. There is now due and owing and unpaid from defendants, and each of them, to Use-Plaintiff the sum of $194,336.00, together with interest thereon from the time such payments became due.

-8-

COMPLAINT FOR RECOVERY ON MILLER ACT PAYMENT BOND, etc.

1    38.    In accordance with the provisions of Civil Code Section 1717.5, Use-Plaintiff is entitled

2        to recover its attorneys' fees.

3        WHEREFORE, the United States of America, for the use and benefit of George E.

4    Masker, Inc. prays for judgment against defendants, and each of them, as follows:

5        On All Causes of Action:

6        1.    For damages in the principal sum of $194,336.00, and such further damages

            according to proof;

7        2.    For statutory penalties at the rate of 2% per month on all principal damages;

8        3.    For interest at the prevailing state legal rate of 10% per annum on all damages

9    from September 1, 2007 through Judgment;

10        4.    For attorneys' fees according to proof under the contract and state law cited

11    above;

12        5.    For costs of suit incurred herein;

13        6.    And for such other and further relief as the Court may deem just and proper;

        DEMAND FOR JURY TRIAL

14        Pursuant to Rule 3-6(a) of the Civil Local Rules for the United States District Court for

15    the Northern District of California, Use-Plaintiff George E. Masker, Inc. hereby demands a trial

16    by jury.

17    Dated: January 17, 2008                    THE MAU LAW FIRM

18                                /s/ *Michael L. Mau*
                                _____
19                                Michael L. Mau, Esq.
                                Attorneys for Use-Plaintiff
20                                George E. Masker, Inc.

C:\My Documents\Masker v. D/M/N\ComplaintFederal.doc

21

22

23

24

25

                            -9-

        COMPLAINT FOR RECOVERY ON MILLER ACT PAYMENT BOND, etc.

American Casualty Company Reading, PA, Bond No. 929256521, 929264
National Union Fire Insurance Company of Pittsburgh, PA Bond No. 260161

| **PAYMENT BOND** (See instructions on reverse) | DATE BOND EXECUTED (Must be same or later than date of contract) August 13, 2002 | FORM APPROVED OMB NO. 9000-0045 |
|---|---|---|

Public reporting burden for this collection of information is estimated to average 25 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden to the FAR Secretariat (VRS), Office of Federal Acquisition Policy, GSA, Washington, D.C. 20405; and to the Office of Management and Budget, Paperwork Reduction Project (9000-0045), Washington, D.C. 20503.

| PRINCIPAL (Legal name and business address) **Dick/Morganti/Nibbi, A Joint Venture** 1900 State Route 51 Large, PA 15025 | TYPE OF ORGANIZATION ("x" one) | |
|---|---|---|
| | ☐ INDIVIDUAL | ☐ PARTNERSHIP |
| | ☒ JOINT VENTURE | ☐ CORPORATION |
| | STATE OF INCORPORATION | |

| SURETY(IES) (Name(s) and business address(es)) **American Casualty Company of Reading, PA** CNA Plaza, Chicago, IL 60685 **National Union Fire Insurance Company of Pittsburgh, PA** 70 Pine Street, New York, NY 10270 | PENAL SUM OF BOND | | | |
|---|---|---|---|---|
| | MILLION(S) 3 | THOUSAND(S) 500 | HUNDRED(S) 000 | CENTS 00 |
| | CONTRACT DATE May 6, 2002 | | CONTRACT NO GS-09P-02-KTC-0002 | |

*3/2 7557276 Ref Bond*

**OBLIGATION:**

We, the Principal and Surety(ies), are firmly bound to the United States of America (hereinafter called the Government) in the above penal sum. For payment of the penal sum, we bind ourselves, our heirs, executors, administrators, and successors, jointly and severally. However, where the Sureties are corporations acting as co-sureties, we, the Sureties, bind ourselves in such sum "jointly and severally" as well as "severally" only for the purpose of allowing a joint action or actions against any or all of us. For all other purposes, each Surety binds itself, jointly and severally with the Principal, for the payment of the sum shown opposite the name of the Surety. If no limit of liability is indicated, the limit of liability is the full amount of the penal sum.

**CONDITIONS:**

The above obligation is void if the Principal promptly makes payment to all persons having a direct relationship with the Principal or a subcontractor of the Principal for furnishing labor, material or both in the prosecution of the work provided for in the contract identified above, and any authorized modifications of the contract that subsequently are made. Notice of those modifications to the Surety(ies) are waived.

**WITNESS:**

The Principal and Surety(ies) executed this payment bond and affixed their seals on the above date.

| | PRINCIPAL | | | | |
|---|---|---|---|---|---|
| SIGNATURE(S) | 1. Dick/Morganti/Nibbi, A Joint Venture (Seal) | 2. (Seal) | 3. (Seal) | | Corporate Seal |
| NAME(S) & TITLE(S) (Typed) | 1. | 2. | 3. | | |

| | INDIVIDUAL SURETY(IES) | | | |
|---|---|---|---|---|
| SIGNATURE(S) | 1. (Seal) | 2. | | (Seal) |
| NAME(S) (Typed) | 1. | 2. | | |

| | CORPORATE SURETY(IES) | | | | |
|---|---|---|---|---|---|
| SURETY A | NAME & ADDRESS | American Casualty Company of Reading, PA Two Chatham Center, Pittsburgh, PA 15230 | STATE OF INC. PA | LIABILITY LIMIT $35,962,000.00 | |
| | SIGNATURE(S) | 1. *Jean Brooker* | 2. | | Corporate Seal |
| | NAME(S) & TITLE(S) (Typed) | 1. Jean Brooker, Attorney-in-Fact | 2. | | |

| NSN 7540-01-152-8061 Previous edition not usable | EXPIRATION DATE 12-31-92 | 25-205 | STANDARD FORM 25-A (REV. 1-90) Prescribed by GSA – FAR (48 CFR) 53.228(c) |
|---|---|---|---|

CORPORATE SURETY(IES) (Continued)

| | | | | |
|---|---|---|---|---|
| **SURETY B** | **NAME & ADDRESS** | National Union Fire Insurance Company of Pittsburgh, PA 70 Pine Street, New York, NY 10270 | **STATE OF INC.** NY | **LIABILITY LIMIT** $280,997,000.00 |
| | **SIGNATURE(S)** | 1. *Jean Brooker* | 2. | Corporate Seal |
| | **NAME(S) & TITLE(S)** (Typed) | 1. Jean Brooker, Attorney-in-Fact | 2. | |
| **SURETY C** | **NAME & ADDRESS** | | **STATE OF INC.** | **LIABILITY LIMIT** $ |
| | **SIGNATURE(S)** | 1. | 2. | Corporate Seal |
| | **NAME(S) & TITLE(S)** (Typed) | 1. | 2. | |
| **SURETY D** | **NAME & ADDRESS** | | **STATE OF INC.** | **LIABILITY LIMIT** $ |
| | **SIGNATURE(S)** | 1. | 2. | Corporate Seal |
| | **NAME(S) & TITLE(S)** (Typed) | 1. | 2. | |
| **SURETY E** | **NAME & ADDRESS** | | **STATE OF INC.** | **LIABILITY LIMIT** $ |
| | **SIGNATURE(S)** | 1. | 2. | Corporate Seal |
| | **NAME(S) & TITLE(S)** (Typed) | 1. | 2. | |
| **SURETY F** | **NAME & ADDRESS** | | **STATE OF INC.** | **LIABILITY LIMIT** $ |
| | **SIGNATURE(S)** | 1. | 2. | Corporate Seal |
| | **NAME(S) & TITLE(S)** (Typed) | 1. | 2. | |
| **SURETY G** | **NAME & ADDRESS** | | **STATE OF INC.** | **LIABILITY LIMIT** $ |
| | **SIGNATURE(S)** | 1. | 2. | Corporate Seal |
| | **NAME(S) & TITLE(S)** (Typed) | 1. | 2. | |

## INSTRUCTIONS

1. This form is authorized for use in connection with Government contracts. Any deviation from this form will require the written approval of the Administrator of General Services.

2. Insert the full legal name and business address of the Principal in the space designated "Principal" on the face of the form. An authorized person shall sign the bond. Any person signing in a representative capacity (e.g., an attorney-in-fact) must furnish evidence of authority if that representative is not a member of the firm, partnership, or joint venture, or an officer of the corporation involved.

3. (a) Corporation executing the bond as sureties must appear on the Department of the Treasury's List of the approved sureties and must act within the limitation listed therein. Where more than one corporate surety is involved their names and addresses shall appear in the spaces (Surety A, Surety B, etc.) headed "CORPORATE SURETY(IES)."

In the space designated "SURETY(IES)" on the face of the form insert only the letter identification of the sureties.

(b) Where individual sureties are involved, a completed Affidavit of Individual Surety (Standard Form 28), for each individual surety shall accompany the bond. The government may require the surety to furnish additional substantiating information concerning its financial capability.

4. Corporations executing the bond shall affix their corporate seals. Individuals shall execute the bond opposite the word "Corporate Seal", and shall affix an adhesive seal if executed in Maine, New Hampshire, or any jurisdiction requiring adhesive seals.

5. Type the name and title of each person signing this bond in the space provided.

American Home Assurance Company
National Union Fire Insurance Company of Pittsburgh, Pa.
Principal Bond Office: 70 Pine Street, New York, N.Y. 10270

**POWER OF ATTORNEY**

No. 04-B-07407

## KNOW ALL MEN BY THESE PRESENTS:

That American Home Assurance Company, a New York corporation, and National Union Fire Insurance Company of Pittsburgh, Pa., a Pennsylvania corporation, does each hereby appoint

—Kevin A. White, Susan M. Kedian, Mark P. Herendeen, Jean M. Feeney, Michael J. Cusack, Jean Brooker of Boston, Massachusetts—

its true and lawful Attorney(s)-in-Fact, with full authority to execute on its behalf bonds, undertakings, recognizances and other contracts of indemnity and writings obligatory in the nature thereof, issued in the course of its business, and to bind the respective company thereby.

IN WITNESS WHEREOF, American Home Assurance Company and National Union Fire Insurance Company of Pittsburgh, Pa. have each executed these presents

this 3rd day of June, 2002

Michael C. Fay, Vice President

---

STATE OF NEW YORK    }
COUNTY OF NEW YORK  }ss.

On this 3rd day of June, 2002 before me came the above named officer of American Home Assurance Company and National Union Fire Insurance Company of Pittsburgh, Pa., to me personally known to be the individual and officer described herein, and acknowledged that he executed the foregoing instrument and affixed the seals of said corporations thereto by authority of his office.

DOROTHY L. PARKER
Notary Public, State of New York
No. 01PA6060931
Qualified in Richmond County
Commission Expires June 24, 20__

### CERTIFICATE

Excerpts of Resolutions adopted by the Boards of Directors of American Home Assurance Company and National Union Fire Insurance Company of Pittsburgh, Pa. on May 18, 1976:

"RESOLVED, that the Chairman of the Board, the President, or any Vice President be, and hereby is, authorized to appoint Attorneys-in-Fact to represent and act for and on behalf of the Company to execute bonds, undertakings, recognizances and other contracts of indemnity and writings obligatory in the nature thereof, and to attach thereto the corporate seal of the Company, in the transaction of its surety business;

"RESOLVED, that the signatures and attestations of such officers and the seal of the Company may be affixed to any such Power of Attorney or to any certificate relating thereto by facsimile, and any such Power of Attorney or certificate bearing such facsimile signatures or facsimile seal shall be valid and binding upon the Company when so affixed with respect to any bond, undertaking, recognizance or other contract of indemnity or writing obligatory in the nature thereof;

"RESOLVED, that any such Attorney-in-Fact delivering a secretarial certification that the foregoing resolutions still be in effect may insert in such certification the date thereof, said date to be not later than the date of delivery thereof by such Attorney-in-Fact."

I, Elizabeth M. Tuck, Secretary of American Home Assurance Company and of National Union Fire Insurance Company of Pittsburgh, Pa. do hereby certify that the foregoing excerpts of Resolutions adopted by the Boards of Directors of these corporations, and the Powers of Attorney issued pursuant thereto, are true and correct, and that both the Resolutions and the Powers of Attorney are in full force and effect.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed the facsimile seal of each corporation

this 13th day of August, 2002




Elizabeth M. Tuck, Secretary

65166 (4/96)

# POWER OF ATTORNEY APPOINTING INDIVIDUAL ATTORNEY-IN-FACT

**Know All Men By These Presents,** That CONTINENTAL CASUALTY COMPANY, an Illinois corporation, NATIONAL FIRE INSURANCE COMPANY OF HARTFORD, a Connecticut corporation, AMERICAN CASUALTY COMPANY OF READING, PENNSYLVANIA, a Pennsylvania corporation (herein collectively called "the CCC Surety Companies"), are duly organized and existing corporations having their principal offices in the City of Chicago, and State of Illinois, and that they do by virtue of the signature and seals herein affixed hereby make, constitute and appoint

Jean Brooker, Michael J. Cusack, Jean M. Feeney, Mark P. Herendeen, Susan K. Kedian, Kevin A. White, Individually

of    Boston, Massachusetts

their true and lawful Attorney(s)-in-Fact with full power and authority hereby conferred to sign, seal and execute for and on their behalf bonds, undertakings and other obligatory instruments of similar nature

- In Unlimited Amounts -

and to bind them thereby as fully and to the same extent as if such instruments were signed by a duly authorized officer of their corporations and all the acts of said Attorney, pursuant to the authority hereby given are hereby ratified and confirmed.

This Power of Attorney is made and executed pursuant to and by authority of the By-Laws and Resolutions, printed on the reverse hereof, duly adopted, as indicated, by the Boards of Directors of the corporations.

In Witness Whereof, the CCC Surety Companies have caused these presents to be signed by their Group Vice President and their corporate seals to be hereto affixed on this    31st    day of    July    , 1998 .

CONTINENTAL CASUALTY COMPANY
NATIONAL FIRE INSURANCE COMPANY OF HARTFORD
AMERICAN CASUALTY COMPANY OF READING, PENNSYLVANIA

*Marvin J. Cashion*

Marvin J. Cashion                    Group Vice President

State of Illinois, County of Cook, ss:

On this    31st    day of    July    , 1998 , before me personally came Marvin J. Cashion, to me known, who, being by me duly sworn, did depose and say: that he resides in the City of Chicago, State of Illinois; that he is a Group Vice President of CONTINENTAL CASUALTY COMPANY, NATIONAL FIRE INSURANCE COMPANY OF HARTFORD, and AMERICAN CASUALTY COMPANY OF READING, PENNSYLVANIA described in and which executed the above instrument; that he knows the seals of said corporations; that the seals affixed to the said instrument are such corporate seals; that they were so affixed pursuant to authority given by the Boards of Directors of said corporations and that he signed his name thereto pursuant to like authority, and acknowledges same to be the act and deed of said corporations.

*Mary Jo Abel*

My Commission Expires March 6, 2000                    Mary Jo Abel                    Notary Public

## CERTIFICATE

I, Mary A. Ribikawskis, Assistant Secretary of CONTINENTAL CASUALTY COMPANY, NATIONAL FIRE INSURANCE COMPANY OF HARTFORD, and AMERICAN CASUALTY COMPANY OF READING, PENNSYLVANIA do hereby certify that the Power of Attorney herein above set forth is still in force, and further certify that the By-Law and Resolution of the Board of Directors of each corporation printed on the reverse hereof are still in force. In testimony whereof I have hereunto subscribed my name and affixed the seals of the said corporations this    13th   day of    August    , 2002 .

CONTINENTAL CASUALTY COMPANY
NATIONAL FIRE INSURANCE COMPANY OF HARTFORD
AMERICAN CASUALTY COMPANY OF READING, PENNSYLVANIA

*Mary A. Ribikawskis*

Mary A. Ribikawskis                    Assistant Secretary

(Rev.10/1/97)

Bond Numbers 929256521, 929264499 and 260161

| CONSENT OF SURETY AND INCREASE OF PENALTY | 1. CONTRACT NUMBER GS-09P-02-KTC-0002 | 2. MODIFICATION NUMBER | 3. DATED March 6, 2003 |
|---|---|---|---|

4. The surety (co-sureties) consents (consent) to the foregoing contract modification and agrees (agree) that its (their) bond or bonds shall apply and extend to the contract as modified or amended. The principal and surety (co-sureties) further agree that on or after the execution of this consent, the penalty of the performance bond or bonds increased by $133,826,918.07 dollars ($133,826,918.07) and the penalty of the payment bond or bonds is increased by $133,826,918.07 Dollars ($133,826,918.07) However, the increase of the liability of each co-surety resulting from this consent shall not exceed the sums shown below.

| 5. NAME OF SURETY(IES) | 6. INCREASE IN LIABILITY LIMIT UNDER | 7. INCREASE IN LIABILITY LIMIT UNDER |
|---|---|---|
| A. American Casualty Company of Reading, PA | $ 35,962,000.07 | $ 35,962,000.07 |
| B. Continental Casualty Company | $ 69,761,265.22 | $ 69,761,265.22 |
| C. National Union Fire Insurance Company of Pittsburgh PA | $ 28,103,652.78 | $ 28,103,652.78 |

| 8. INDIVIDUAL PRINCIPAL | A. BUSINESS ADDRESS | B. SIGNATURE | |
|---|---|---|---|
| | | C. TYPED NAME AND TITLE | [Affix Seal] |
| | | D. DATE THIS CONSENT EXECUTED | |

| 9. CORPORATE PRINCIPAL | A. CORPORATE NAME AND BUSINESS ADDRESS Dick/Morganti/Nibbi, A Joint Venture 1900 State Route 51 Large, PA 15025 | B. PERSON EXECUTING CONSENT (Signature) BY C. TYPED NAME AND TITLE John T. Sebastian Corporate Vice President (Dick) Authorized Representative of the Joint Venture D. DATE THIS CONSENT EXECUTED | (Affix Corporate Seal) |
|---|---|---|---|

The Principal or authorized representative shall execute this Consent of Surety with the modification to which it pertains. If the representative (e.g., attorney-in-fact) that signs the consent is not a member of the partnership, or joint venture, or an officer of the corporation involved, a Power-of-Attorney or a Certificate of Corporate Principal must accompany the consent.

**10. CORPORATE/INDIVIDUAL SURETY (CO-SURETIES)**

| | A. CORPORATE/INDIVIDUAL SURETY'S NAME AND ADDRESS | B. PERSON EXECUTING CONSENT (Signature) | |
|---|---|---|---|
| A | American Casualty Company of Reading, PA CNA Plaza Chicago, IL 60685 | BY C. TYPED NAME AND TITLE Jean Brooker Attorney-in-Fact F. DATE THIS CONSENT EXECUTED 3/13/03 | (Affix Corporate Seal) |
| B | A. CORPORATE/INDIVIDUAL SURETY'S NAME Continental Casualty Company CNA Plaza Chicago, IL 60685 | B. PERSON EXECUTING CONSENT (Signature) B C. TYPED NAME AND TITLE Jean Brooker Attorney-in-Fact D. DATE THIS CONSENT EXECUTED 3/13/03 | (Affix Corporate Seal) |
| C | A. CORPORATE/INDIVIDUAL SURETY'S NAME National Union Fire Insurance Company of Pittsburgh, PA 70 Pine Street New York, NY 10270 | B. PERSON EXECUTING CONSENT (Signature) BY C. TYPED NAME AND TITLE Jean Brooker Attorney-in-Fact D. DATE THIS CONSENT EXECUTED 3/13/03 | (Affix Corporate Seal) |

Add similar signature blocks on the back of this form if necessary for additional co-sureties.

# SUBCONTRACT AGREEMENT

**THIS AGREEMENT**, made this 23rd day of **September**, 2003, by and between George E. Masker, Inc. 887 71st Avenue, Oakland, CA, Phone: 510-568-1206, Fax: 510-638-2530, Attention: Alan Bjerke, hereinafter called the Subcontractor and Dick / Morganti, Joint Venture 1068 Mission Street, San Francisco, CA 94103, Attention: Thomas J. DeMarco, Phone: 415-522-1320, Fax: 415-522-1366 hereinafter called the Contractor.

For the consideration hereinafter named, the said Subcontractor covenants and agrees with the said Contractor as follows, to wit:

**FIRST:** This Subcontractor agrees to furnish all the necessary supervision, labor, tools, materials, services, equipment, machinery, consumables, expendables, and other items proper and/or necessary in doing the **Painting, Graffiti Resistant Coating, Water Repellant Coating and Exterior Intumescent Fireproofing**, and as required for the GSA Federal Building Project, located in San Francisco, CA, being constructed by Dick / Morganti, Joint Venture (Contractor) for GSA - General Services Administration (Owner) pursuant to the terms and conditions of the General Contract between Owner and Contractor and the terms stated herein.

## A.     SCOPE OF WORK

It is understood and agreed that this Subcontractor's Scope of Work (hereinafter referred to as Work) includes, but is not limited to the following:

Subcontractor agrees to supply and install all materials as required to provide a complete product as described in or reasonably inferable from the Contract Documents and in accordance with, but not limited by, the following sections of the specifications:

| | |
|---|---|
| Division 1 | General Requirements |
| *Division 2 | Site Construction |
| 02765 | Pavement Markings |
| *Division 3 | Concrete |
| *Division 5 | Metals |
| *Division 6 | Wood & Plastics |
| *Division 7 | Thermal & Moisture Protection |
| 07190 | Water Repellant |
| 07814 | Exterior Intumescent Fireproofing |
| 09900 | Painting |
| 09965 | Graffiti-Resistant Coating |
| *Division 8 | Doors and Windows |
| *Division 9 | Finishes |
| *Division 10 | Specialties |
| *Division 11 | Equipment |
| *Division 12 | Furnishings |
| *Division 13 | Special Construction |
| *Division 14 | Conveying Systems |
| *Division 15 | Mechanical |
| *Division 16 | Electrical |

*= As applicable to this scope of work only.

This Subcontractor agrees to furnish all **Painting, Graffiti Resistant Coating, Water Repellant Coating and Exterior Intumescent Fireproofing** in strict accordance with Specification Sections above and 01110 through 01820, subject to exclusions noted herein

The lump sum amount of this subcontract agreement specifically includes, but is not limited to, the following:

1.     It is specifically understood that any and all costs associated with the scope additions/revisions included with the issuance of the "Final Construction Documents", dated 02/14/2003, are included in the lump sum amount of this Subcontract.

2.     It is specifically understood that this Subcontractor shall furnish a crane, operating engineer, and any other equipment required for the hoisting and movement of this Subcontractor's material. Contractor will provide a personnel hoist, (size not guaranteed), for use of all trades when the structure of the building is past three floors. This Subcontractor may use this equipment, upon 48-hour prior request and approval by

FOR THE PROJECT KNOWN AS:

GSA Federal Building, San Francisco
Subcontract Number 21056-129
GSA Contract No. GS-09P-02-KTC-0002
GSA Project No. NCA00049
COST CODE: 099000
1 of 23

Exh. 2

Dick/Morganti's superintendent, provided that all loads are within the hoist's capacity for size and weight. The Subcontractor recognizes that the Contractor's hoist is a piece of machinery that is subject to occasional failure and, therefore, the Subcontractor assumes any impacts due to the unscheduled shutdown of the equipment. The Contractor will not acknowledge or accept any claims for stand-by time, productivity loss, etc., due to the equipment failure. The Subcontractor shall pay all costs incurred by the Contractor for operation of the man/material hoist during premium time hours for the Subcontractors sole benefit. The personnel hoist will be installed in two phases. Phase one installation will occur up to the fourth floor, at such time as the structure is ready to accept the hoist. Phase two installation will include the remainder above, at such time, as the structure is ready to accept the hoist. The Subcontractor shall provide all out-of-sequence labor, material and special connections, if any, required remobilizing and completing his work at the personnel hoist bay when the personnel hoist bay is removed.

3.  This Subcontractor is responsible to Furnish and install all Painting, Graffiti Resistant Coating, Water Repellant Coating and Exterior Intumescent Fireproofing, including all necessary labor, materials, tools, equipment, plant supervision, etc. and pay all applicable taxes and fees required. This Subcontractor has included all necessary work based upon his understanding on the intent of the Documents, his experience in completing projects of similar size and complexity, and analysis of similar areas in the building where the work is better defined. This Subcontractor has included all items proper, necessary and required regardless of whether or not such work is indicated by the Drawings, with the exception of clear changes in scope.

4.  Subcontractor agrees that the total mark-up rate (Overhead and Profit) allowed for all change orders will be ten (10) percent. This rate shall be applied to the total negotiated direct costs of any modification.

5.  Performance and Payment Bonds.

6.  Sales tax.

7.  All scaffolding ladders and lifts required to complete this scope of work.

8.  All exposed surfaces unless otherwise noted. All painting and finishing required for this project is included in this Subcontract and requests for additional work authorizations will not be accepted unless it is additional scope to the General Contract and accepted and compensated by the Owner.

9.  ✓ Painting of all exposed mechanical and electrical work specified in divisions 15 and 16 that is not required for system identification.

10. Non-ferrous metals, plated or factory-finished items, specifically noted to be painted where such items occur as accessories or appurtenances to units otherwise required to be painted.

11. Field paint the following exposed mechanical and electrical items to match adjacent surfaces even if such items are factory-finished. 1) Wall and ceiling diffusers/registers. 2) Wall and ceiling speakers. 3) Flush mounted electrical panel boards and cabinets.

12. Semi-visible areas behind registers, grills, diffusers, screen vents, cement board, drywall, ceilings or similar items.

13. Vision panel frames in wood doors even if they are factory finished.

14. Water repellant for exterior concrete surfaces, except for concrete paving and interior vertical concrete surfaces (columns and shear walls).

15. Graffiti-resistant coating for exterior concrete surfaces within 3000 mm of grade or nearest point and painted hollow metal doors and frames within 3000 mm of grade or nearest point.

16. Pavement markings.

17. Nothing listed above is meant to limit the scope of this Subcontract Agreement in any way. It is clearly understood that the lump sum amount of this Subcontract Agreement includes all Painting, Graffiti Resistant Coating, Water Repellant Coating and Exterior Intumescent Fireproofing required for this project.

18. Caulking door frames.

FOR THE PROJECT KNOWN AS:

GSA Federal Building, San Francisco
Subcontract Number 21058-129
GSA Contract No. GS-09P-02-KTC-0002
GSA Project No. NCA00049
COST CODE:   099000

2 of 23

**B.    WORK BY OTHERS**

√1.  Mechanical and electrical system identification.

2.  Trade damage. Subcontractor will assist Contractor in identifying party causing damage.

3.  Concrete parking bumpers.

**C.    SPECIAL CONDITIONS**

1.  The Subcontractor shall bear all risk, costs and expense incurred in dealing with any adverse physical conditions and artificial obstructions whether foreseeable or not at the time of execution of this Agreement, provided that:

   a.    No hazardous wastes or toxic material exists onsite
   b.    No unknown archaeological conditions are encountered

   Subcontractor has the obligation to notify the Contractor of any such conditions and obstructions encountered in due course, especially if such findings could or would affect the execution of other project works.

2.  <u>Hazardous Substances.</u>  Subcontractor will take all measures necessary to prevent the release of any Hazardous Substances at the Facility Site or adjacent areas. Subcontractor will immediately notify Contractor of any spills, emissions or other releases of Hazardous Substances that occur in connection with the performance of the Work. Subcontractor will be responsible for removing from the Facility Site and areas adjacent thereto, and for properly disposing of, in a manner acceptable to Contractor and in compliance with the Contract Documents, all Applicable Laws and Applicable Permits, all Hazardous Substances generated, released or accumulated by Subcontractor or any Sub-Subcontractor in the course of performing the Work and that did not exist on the Facility Site prior to the date of the Agreement. In the event Subcontractor encounters on the Facility Site material reasonably believed to be a pre-existing Hazardous Substance, then Subcontractor will immediately cease performance of any Work in the area affected and report the condition to Contractor in writing. Subcontractor will not thereafter resume performance of the Work in the affected area except with the prior written permission of Contractor.

3.  <u>Environmental Matters.</u>

   a.    <u>Left Blank.</u>

   b.    <u>Pre-Existing Hazardous Substances.</u>  To the extent that any excavated or disturbed Hazardous Substances are determined to be solid waste, hazardous waste, hazardous debris, or contaminated media under Applicable Law, the Owner shall be considered the generator of such waste under Applicable Law rather than Contractor or Subcontractor, and Owner agrees to be identified as such on any bill of lading, manifest or other documentation required under Applicable Law to be completed in order to transport or dispose of the Hazardous Substance. Furthermore, the Owner, rather than the Contractor or Subcontractor, will be solely responsible for compliance with any other obligation imposed by Applicable Law upon the generator of such waste or the owner or operator of a solid waste management facility.

   c.    <u>Management of Pre-Existing Hazardous Substances.</u>  In the event that Subcontractor encounters soil, sediments, debris or subsurface material at the Facility Site where the Subcontractor reasonably believes contains Hazardous Substances that existed at the Facility Site prior to the date of the Agreement, the Subcontractor may report the condition to Contractor and cease performance of any Work if the Subcontractor reasonably believes that it is necessary in order to comply with the Project Safety Manual or Applicable Law. Subcontractor will not thereafter resume performance of the Work in the affected area except with the prior written permission of the Contractor.

4.  This Subcontractor will procure the contractor licenses from local agencies applicable to this Subcontractor's Scope of Work and as required to be able to work on this project.

5.  This Subcontractor acknowledges that its prices were based on the drawings, specifications, information and documents provided and this Subcontractor's own experience. This Subcontractor agrees that the prices in this Subcontract Agreement are applicable to the performance of any and all the Work called for in this Subcontract Agreement and as required for this Project.

FOR THE PROJECT KNOWN AS:

GSA Federal Building, San Francisco
Subcontract Number 21056-129
GSA Contract No. GS-09P-02-KTC-0002
GSA Project No. NCA00049
COST CODE:  099000

1 of 23

6.  This Subcontractor acknowledges that he is solely responsible for the productivity of its work force, man-hours required to complete the Work and the effort required to meet the Project schedule.

7.  This Subcontractor acknowledges that it may work periodic overtime at its discretion and cost.

8.  This Subcontractor shall commence work on site within 7 days following Notice to Proceed from Contractor and shall pursue the work without any interruption until fully completed.

9.  On site parking is not available.  The subcontractor is responsible for employee and sub-subcontractor parking offsite.

10.  Nothing listed above is meant to limit the scope of this Subcontract Agreement in any way. It is clearly understood that the lump sum amount of this Subcontract Agreement includes all of the work necessary to complete, in accordance with the contract documents, all work as defined in Scope of Work for this project.

11.  This Subcontractor agrees to perform the work as necessary in order to satisfy the scheduling requirements of this project as set forth in the General Contract.

12.  All priming, painting or touch-up required as a result of installation activities performed by this Subcontractor will be the sole responsibility of this Subcontractor.

13.  Materials used, products supplied and quality of workmanship must be in strict conformance with the specifications and acceptable to the Engineer/Owner/Architect.

14.  This Subcontractor will be required to furnish necessary drawings, submittals, samples, manuals and data required by the specifications in a timely manner in order not to delay the progress of the job. Submittals shall all be submitted in accordance with Section 01330 for approval within six (6) weeks (or sooner as applicable, in accordance with the project schedule), of the date of execution of this subcontract agreement unless otherwise authorized, in writing, by the General Contractor.

15.  A record set of drawings shall be kept at the jobsite, and marked current with as-built conditions, to be turned over to the Contractor at work completion. The drawings must be legible, reproducible, and as required by Section 01781.

16.  This agreement includes all documentation and personnel required to satisfy the quality control and testing requirements set forth in the respective specifications (except as specifically provided by others).

17.  Hoisting of equipment and materials scheduled to be furnished by this Subcontractor shall be the responsibility of this Subcontractor. See section A Scope of Work for use of Contractors Man/Material Hoist and Cranes.

18.  It is specifically understood this Subcontractor shall cooperate with the testing laboratory utilized by the Contractor and Owner. Retesting costs incurred by the Testing Lab due to deficient work performed by this Subcontractor shall be borne by this Subcontractor.

19.  All required certifications shall be furnished by this Subcontractor. This agreement includes all documentation and personnel required to satisfy the quality control requirements set forth in specifications.  This includes any testing or inspection by an approved independent testing laboratory, agency or professional engineer registered in California if required by the contract documents.

20.  Provisions required by the Buy American Act are specifically included in this Subcontract Agreement

21.  This Subcontract includes all required mobilizations and demobilizations necessary to complete the work.

22.  It is understood that time is of the essence for this project. The Subcontractor has reviewed the project schedule and work activities specific for this Subcontractor's scope of work with the understanding he shall meet the dates indicated or complete work prior to those dates specified for the Subcontractor's scope of work.

23.  It is also understood that this Subcontractor will perform his Scope of Work in accordance with the sequencing of the project schedule.  If preceding sequences complete earlier than

FOR THE PROJECT KNOWN AS:

GSA Federal Building, San Francisco
Subcontract Number 21058-129
GSA Contract No. GS-09P-02-KTC-0002
GSA Project No. NCA00049
COST CODE: 099000

4 of 23

anticipated, this Subcontractor may be requested to accelerate the start of their scheduled work activities and proceed at the anticipated schedule duration of the work activity with the understanding this acceleration is not over and above the intent of this Subcontract Agreement.

24.    This Subcontractor must supply for his own use the following if required:

- Field Office and/or storage and tool trailer.
- Temporary utilities including telephone service as required.
- Drinking water and ice.
- Hoisting equipment for materials/manpower.
- Safety and barricades
- Layout from benchmarks and control lines provided by the contractor
- All scaffolding, high lifts, ladders, etc.

25.    The Owner has the right to approve or disapprove the employment of this Subcontractor. In the event that the Owner does not approve this Subcontractor, this Subcontract shall become null and void. The Contractor reserves the right to approve or disapprove the Subcontractor's personnel.

26.    This Subcontractor will be responsible to complete all punch list items within the time limits established by the Contractor.

27.    The Contract Documents, Section "F", Article No. 2, contain provisions for the assessment of liquidated damages. Should such damages be assessed by the Owner as a result of this Subcontractor's failure to timely perform, this Subcontractor shall be accordingly liable for such damages, if assessed

28.    It is specifically agreed that this Subcontractor shall provide all inserts, anchors, clips, and all other such fastening devices necessary to complete installation of the work included as part of the scope of this Subcontract Agreement.

29.    It is specifically understood that this Subcontractor will provide all warranties, owner's manuals, and owner training, and testing as required by the Contract Documents.

30.    It is specifically understood that this Subcontractor will provide and install all cutting, patching, core drilling, inserts, sleeves, etc., as required to provide a complete installation of the work included herein.

31.    The lump sum amount of this Subcontract Agreement indicated below shall be firm for the duration of the project and is not subject to any escalation for material or labor.

32.    This Subcontractor shall discuss the means and methods to be utilized in all operations with the Contractor's Superintendent prior to commencement of any work.

33.    This Subcontractor shall coordinate his work with the work of other subcontractors and suppliers.

34.    This Subcontractor is responsible for the shipment and receiving of all materials associated with the work as included as part of this Subcontract agreement and furthermore will be responsible for the protection and safe keeping of this material until final acceptance by the Owner. Due to limited access to the building, all deliveries must be coordinated with Dick/Morganti's Project Superintendent. Notice must be given 48 hours in advance and access will be on a first-come, first-served basis. It is specifically understood that this Subcontractor is responsible for all hoisting, equipment and manpower for hoisting, required for the work included as part of this subcontract agreement. See section A Scope of Work for use of Contractors Man/Material Hoist and Cranes.

35.    It is specifically understood this project is governed by the wage rates associated with the "General Decision CA010029" as indicated in the Contract Documents.

36.    In accordance with the requirements of the Contract Documents, this Subcontractor shall submit weekly certified payrolls, failure to provide this information will affect the approval of payment requisitions.

37.    It is specifically understood that the lump sum value of this Subcontract includes any applicable sales and use taxes.

FOR THE PROJECT KNOWN AS:

GSA Federal Building, San Francisco
Subcontract Number 21058-129
GSA Contract No. GS-09P-02-KTC-0002
GSA Project No. NCA00049
COST CODE: 099000
5 of 23

38. This Subcontractor is responsible for cleaning the streets of any mud or debris deposited by vehicles associated with the work performed under this Subcontract Agreement.

39. This Subcontractor must remove and replace any temporary handrail as needed to complete the work included in this Subcontract agreement.

40. This Subcontractor shall provide and fulfill the insurance requirements required by Dick/Morganti. This Subcontractor shall include Dick/Morganti, the Dick Corporation, the Morganti Group, the Owner, Construction Manager, and the Architect as additional insured at no additional cost

41. This Subcontractor shall provide all information required for Applications for Payment prior to submitting the first Pay Request and within four (4) weeks from the date of this Agreement.

42. All daily reports, certified payrolls, accident reporting, written notifications, inspections notifications, etc. shall be provided by this Subcontractor as required by the Contract Documents. Written notifications shall be provided to the Contractor in sufficient time for the Contractor to forward such notifications to the Owner in compliance with the time requirements set forth in the Contract Documents.

43. This Subcontractor shall, without additional expenses to Dick/Morganti, be responsible for obtaining any necessary licenses, fees and permits, and for complying with any Federal, State, and municipal laws, codes, and regulations applicable to the performance of the work. The Subcontractor shall also be responsible for all damages to persons or property that occur as a result of the Subcontractor's fault or negligence and shall ensure proper safety and health precautions to protect the work, the workers, the public, and property of others.

44. All applicable OSHA AND/OR CAL/OSHA standards must be strictly adhered to and any citations or subsequent penalties that are a result of noncompliance of these standards shall be the responsibility of this Subcontractor.

45. It is specifically understood this Subcontractor has a complete understanding of the work required by this Subcontract and any problem areas, uncertainties, discrepancies, dimensions, etc. have been verified.

46. All necessary cleaning, protection and/or repairs to in-place work damaged by this Subcontractor during the handling, transportation, placing, erection, and installation of all items covered under this Agreement shall be the responsibility of this Subcontractor.

47. It is specifically understood the Contractor will enforce strict jobsite cleanliness and this Subcontractor shall be responsible for daily clean up of trash created under this Scope of Work. The trash shall be deposited in the appropriate dumpsters provided by the Contractor. Debris not acceptable to the trash hauling service (excess concrete, rebar, etc.) shall be disposed of by this Subcontractor by his own means

48. It is specifically understood that this Subcontractor will be required to participate in the site-recycling program as required by the contract documents. This is to help divert excess waste from landfills to recycling centers. This Subcontractor will be required to separate its construction debris and dispose of the debris in the proper receptacles. These receptacles will be clearly marked and will be located on the jobsite.

49. This Subcontractor agrees to fully execute and return this Subcontract Agreement within ten (10) working days after receiving it. Or at a minimum, providing written indication of any objections to the provisions included herein within ten (10) working days. A current insurance certificate indicating the coverage required herein must also be received prior to commencing work on site.

50. It is specifically understood itemized labor and material quotations and Change Orders shall be prepared and submitted by this Subcontractor in accordance with the contract documents. This Subcontractor shall submit pricing for all proposed Change Orders within ten (10) working days. This Subcontractor agrees that the total mark-up rate (Overhead and Profit) allowed for all change orders will be ten (10) percent. This rate shall be applied to the total negotiated direct costs of any modification.

51. It is specifically understood that this Subcontractor will provide a Performance bond and a labor and material payment bond each in the amount of the contract value. The costs of these bonds are included in the lump sum amount of this Subcontract agreement.

FOR THE PROJECT KNOWN AS:

GSA Federal Building, San Francisco
Subcontract Number 21058-129
GSA Contract No. GS-09P-02-KTC-0002
GSA Project No. NCA00049
COST CODE: 099000

6 of 23

52. It is specifically understood that the lump sum amount of this Subcontract agreement includes all items and services needed to provide a complete scope of work for the **Painting, Graffiti Resistant Coating, Water Repellant Coating and Exterior Intumescent Fireproofing**. This includes all items and services needed to fully construct this scope of work as contemplated by the drawings and specifications but not necessarily fully described. The amount of this Subcontract includes everything needed to construct the **Painting, Graffiti Resistant Coating, Water Repellant Coating and Exterior Intumescent Fireproofing** with the exception of changes in scope.

53. Task lighting, in addition to that provided per specification 01500 – Temporary Facilities and Controls, shall be the responsibility of each subcontractor.

54. It is specifically understood this Subcontractor shall use Saturdays as make-up days to compensate for normal work days lost during the week due to inclement weather, i.e., rain, winds, heat, etc

55. The Contractor will provide this Subcontractor upon request, one complete set of Contract Documents between the Contractor and the Owner and one Compact Disk.

## D.    SUBCONTRACT PRICE

1. For the successful completion of all Work required by this Subcontract Agreement, the Contractor shall pay to Subcontractor the lump sum amount of **Eight Hundred Five Thousand Seven Hundred Thirteen Dollars ($805,713.00)** hereafter referred to as the Subcontract Price.

Except as otherwise provided below, Subcontractor shall administer and pay all sales, use, import, gross receipts, income, duties and withholding taxes and other taxes and contributions imposed by any taxing authority upon the sale, purchase, transportation or use of materials, supplies, equipment, services or labor to be incorporated in the Facility, including without limitation, taxes on or measured by Subcontractor's receipts hereunder and taxes on or measured by wages earned by employees of Subcontractor (the "Taxes"), and shall furnish to the appropriate taxing authorities all required information and reports in connection with such Taxes.

Option Pricing:

1. Any work in addition to the aforementioned requested by the Contractor and performed by this Subcontractor shall be priced per the schedule of rates that Subcontractor shall submit within five (5) days of execution of this Subcontract Agreement

2. The Subcontract Price listed above is inclusive of all costs to perform the Scope of Work as described in this Subcontract Agreement including but not limited to: costs for all labor, supervision, benefits, payroll taxes, equipment, materials, mobilization of equipment and materials, de-mobilization of equipment and materials, fuels, oil, consumables, expendables, tools of the trade, G&A costs, insurances, home office overheads, jobsite overheads, margin and profit.

3. The Subcontract Price is firm for the duration of the Work and not subject to escalation.

4. All costs incurred by Subcontractor in excess of the Subcontractor Price necessary to complete the Work shall be the sole responsibility of this Subcontractor.

## E.    INVOICE / PAYMENT TERMS

1. The invoice is due on or about, but no later than the 25th of each month. Payment will be made following receipt of an approved invoice and all required information, and then in accordance with the following time periods:

   a. Ten (10) days following receipt of corresponding payment from the Owner

2. In the event payment has not been received from the Owner due to the fault of Subcontractor, the Contractor will withhold payment of the applicable installment until such time as the payment has been received from the Owner.

3. Payment Provisions

   a. The Work described in Article A.1 shall be paid based upon a Subcontractor developed detailed schedule of values which shall be approved by the Contractor. This Work shall be paid per the detailed schedule of values and based on actual progress as determined by Contractor's Project Manager.
   b. Ten (10%) percent shall be withheld from each payment as retention.

FOR THE PROJECT KNOWN AS:

GSA Federal Building, San Francisco
Subcontract Number 21058-129
GSA Contract No. GS-09P-02-KTC-0002
GSA Project No. NCA00049
COST CODE: 099000

7 of 23

c.  Each application for payment hereunder shall be submitted using the Attachments enclosed and shall be accompanied by a certification from Seller that the work covered by the application for payment has been completed and effected in accordance with the design drawings and specification and has progressed to the point indicated on the Invoice.

d.  The invoice original and all required attachments shall be sent to:

> Dick / Morganti Joint Venture
> Attention: Accounting Job No. 21058
> 1900 State Route 51
> Large, PA 15025

A copy of the invoice and all required attachments shall be sent to:

> Dick / Morganti, Joint Venture
> Attention: Thomas J. DeMarco, Senior Project Manager
> 1068 Mission Street
> San Francisco, CA 94103

e.  Final Payment

1.  Following completion of the Work and Final Acceptance including completion of (a) all Work required by this Subcontract Agreement and, (b) satisfactory completion of all punch list items and, (c) receipt by Contractor of all required as-construction drawings and, (d) removal from the Project Site of all Subcontractors tools, equipment and debris and, (e) receipt by Contractor of all required releases and, (f) release of retainage for this work by Owner, the Contractor shall release the final payment including all retention to this Subcontractor.

## F.    FINAL ACCEPTANCE.

1.  This Subcontractor shall perform and have completed the whole of the Work on the Project in accordance with this Subcontract no later than as shown in the agreed to project schedule.

## G.    GENERAL CONDITIONS

1.  Participate in, provide and update Daily Reports, as required by Contractor and herein.

2.  This Subcontractor is aware of the local labor conditions and will comply with the requirements of any applicable local union agreements.

3.  This Subcontractor will comply with the rules established by Contractor for the Project and the Facility.

4.  It is this Subcontractor's responsibility to protect its work and equipment until accepted by the Contractor.

5.  It is the Subcontractor's responsibility to protect the Project Site, surrounding properties existing installations and existing road surfaces from damage. This Subcontractor will be responsible for repairs resulting from such damage. Subcontractor shall abide by the rules established regarding public roads designated for use or closed for use to Project traffic and deliveries.

6.  This Subcontractor shall provide any temporary and construction utilities (i.e., compressed air, task lighting, etc.) as required to perform the Work.

7.  Contractor will provide subcontractor with access and egress to the site.

8.  This Subcontractor shall provide his own telephone, FAX and photocopy services and the cost of same is included in the Subcontract Price.

9.  This Subcontractor agrees to provide access to its Work as requested by the Contractor and the Owner for observations, inspections and to perform tests as required to accept the Work through its various stages.

10. Limited security may be provided at the Facility and work area. This Subcontractor shall comply with the rules for site security developed by the Contractor. The Contractor and Owner shall at no time and in any regard be responsible for any losses that this

FOR THE PROJECT KNOWN AS:

GSA Federal Building, San Francisco
Subcontract Number 21058-125
GSA Contract No. GS-09P-02-KTC-0002
GSA Project No. NCA00049
COST CODE: 059000

8 of 23

Subcontractor, or its employees or Sub-Subcontractors, may incur as a result of the quality of the site security or lack thereof.

11. This Subcontractor shall perform continual, daily clean up of all its work areas and those of its Subcontractors. Trash shall not be allowed to accumulate. Any hazardous or abnormal waste generated by this Subcontractor shall be handled and properly disposed of by this Subcontractor.

12. This Subcontractor shall submit, for the Contractor's written approval, its plan for subcontracting any work prior to the issuance of a Subcontract from this Subcontractor.

13. Included in this Subcontract Agreement by this reference are the soils reports listed here below. This Subcontractor is hereby aware of the existing conditions and has self-determined the impact on the cost of its work, health and safety of its employees and is subsequently fully responsible for the health and safety of its employees.

Subsurface Environmental Investigations Report dated February 14, 1997 as prepared by Treadwell & Rollo, Inc. / Olivia Chen Consultants (T&R/OCC).

Geotech Report dated February 1998 as prepared by Geomatrix Consultants, Inc (Geomatrix).

Geotech Report dated November 2001 as prepared by Geomatrix Consultants, Inc (Geomatrix).

14. This Subcontractor and all Sub-Subcontractors shall provide the insurance coverages required and name, on each certificate, the following as additional insured and all their assignees, subsidiaries and affiliates and cause insurers to waive all rights of subrogation against each of the following and all their assignees, subsidiaries and affiliates.

| Owner: | General Services Administration, United States of America |
| Contractor: | Dick / Morganti, Joint Venture, & Dick Corporation, & Morganti Texas, Inc. |
| Const. Manager: | Hunt Construction Group, Inc. |
| Architect: | Smith Group, Inc. |

15. Quality Program. Subcontractor shall submit for approval by Contractor a quality program describing the organization, including on-site organization, procedures, systems and methods and the like that Subcontractor shall employ on the site to insure a quality performance of the Work.

16. Daily Reports. Subcontractor shall provide a daily report as required by the Contractor. The report shall include equipment and employees on site for the reporting period in a format acceptable to both the Contractor and the Owner.

17. Weekly Employee Reports.    Subcontractor shall report weekly to Contractor the number of Subcontractor employees and Sub-subcontractor employees including management and tradesmen. Report shall include all information as required by the Owner.

18. Certified Payroll reports. Subcontractor shall provide certified payroll reports on a weekly basis for submission to Owner. Reports shall include information as required and be in a format acceptable to Owner.

19. It is specifically understood that the lump sum amount of this Subcontract agreement includes all items and services needed to provide a complete scope of work for the supply and install of **Painting, Graffiti Resistant Coating, Water Repellant Coating and Exterior Intumescent Fireproofing.** This includes all items and services needed to fully construct this scope or work as contemplated by the drawings and specifications but not necessarily fully described. The amount of this Subcontract includes everything needed to complete the scope of work as defined in this Subcontract and the Contract Documents with the exception of changes in scope.

20. It is specifically understood that any and all costs associated with the scope additions/revisions included with the issuance of the "Final Construction Documents", are included in the lump sum amount of this Subcontract.

21. This Subcontractor hereby acknowledges that the lump sum price is based upon incomplete documents and that this Subcontractor has included the costs for work not fully defined or illustrated by the Contract Documents. This Subcontractor has included all necessary work based upon his understanding of the intent of the Documents, his

FOR THE PROJECT KNOWN AS:

GSA Federal Building, San Francisco
Subcontract Number 21058-129
GSA Contract No. GS-09P-02-KTC-0002
GSA Project No. NCA00049
COST CODE: 099000

9 of 23

experience in completing projects of similar size and complexity, and analysis of similar areas in the building where the work is better defined. This Subcontractor has included all items proper, necessary and required regardless of whether or not such work is indicated by the Drawings, with the exception of clear changes in scope

22.     Warranties shall commence upon acceptance by the owner.

23.     Nothing listed above is meant to limit the scope of this Subcontract Agreement in any way. It is clearly understood that the lump sum amount of this Subcontract Agreement includes all of the Painting, Graffiti Resistant Coating, Water Repellant Coating and Exterior Intumescent Fireproofing required for this project.

**H.     ADDITIONAL REQUIREMENTS**

1.     No right or interest in this Agreement shall be assigned by the Subcontractor without the prior written permission of the Contractor, and no delegation of any obligation owed by the Subcontractor shall be made without the prior written permission of the Contractor. Any attempted assignment or delegation shall be wholly void and totally ineffective for all purposes.

2.     The Subcontractor shall bind each sub-vendor/subcontractor to the applicable terms and conditions of this Agreement for the benefit of the Contractor. Any assignment or subcontracting allowed by the Contractor shall not relieve the Subcontractor of its obligations and liabilities.

3.     This Agreement shall not be deemed an asset of the Subcontractor. If Subcontractor enters into any voluntary or involuntary receivership, bankruptcy, or insolvency proceedings, this Agreement may be canceled at the Contractor's option upon five (5) days written notice to Subcontractor.

4.     The Subcontractor shall warrant that it has the right to give the waiver, release and discharge of liens set forth herein and that it has not made any assignment of any rights to claim a lien against the Work to be performed under this Agreement.

5.     The Subcontractor shall continue performance of the Work pursuant to the terms of this Agreement despite any claim it may have against Contractor or any other party or parties to this Agreement.

Subcontractor's work shall be carried out and completed strictly in accordance with the Plans, Specifications, and all Contract Requirements governing this project and in full accordance with the terms and conditions, meaning, and intent of the Contractor's Contract with the Owner (the "General Contract"), which Subcontractor warrants that it has independently investigated and understands. A copy of said General Contract is on file at the Contractor's Office and has been inspected by the Subcontractor, and a copy of the Contract Documents is available upon request. It is further agreed that the provisions of said General Contract, including, but not limited to, the General and Supplementary Conditions, the Specifications and Plans, all Contract Requirements, and the particular Specifications relating to the work of the Subcontractor, insofar as they are applicable, are hereby incorporated herein by this reference and are binding upon the Subcontractor.

All previous oral or written promises and agreements relating to the subject matter of this contract are hereby declared to be null and void, it being expressly agreed that the terms of this Subcontract shall constitute the full and complete agreement between the parties hereto.

IN CONSIDERATION WHEREOF, the Contractor agrees to pay to the Subcontractor for the full and faithful performance by the Subcontractor of all the terms and conditions hereof the sum indicated on page one with said amount to be paid as follows: Ninety percent (90%) of the value of work which has been placed in position to the continuing satisfaction of the Owner and for which payment has been made by said Owner to said Contractor, with ten percent (10%) retained by the Contractor until the last payment is made to the Subcontractor. Subcontractor agrees to assume the risk of payment by the Owner for Subcontractor's work. Receipt of payment from the Owner to the Contractor for Subcontractor's work is an absolute condition precedent to the Subcontractor's right to payment. If for any reason (including but not limited to the insolvency or inability to pay) the Owner does not make payment to the Contractor (including but not limited to any partial or final progress payment, retainage, final payment or payments for changes, extras, modifications or the like or payment on account of any claims for delays or inefficiencies or other claims, or any other payment due on account of Subcontractor's work), Subcontractor shall not be entitled to such payment. Monthly progress payments shall be made on or about the tenth (10th) working day after Contractor is paid, except the last payment, which the Contractor shall pay to said Subcontractor immediately after said materials and labor installed by said Subcontractor have been completed, turned over, and accepted and approved by the Owner, after the final payment is received by the Contractor, and after satisfactory evidence is furnished to the Contractor by the Subcontractor that all

FOR THE PROJECT KNOWN AS:

GSA Federal Building, San Francisco
Subcontract Number 21058-129
GSA Contract No. GS-09P-02-KTC-0002
GSA Project No. NCA00049
COST CODE:  059000

10 of 23

labor, materials, equipment, appurtenances, services, etc. used or incorporated in this particular work have been paid in full.

_____ that it is sufficiently _____ responsible to carry out the work as provided in this Agreement, together with all other work it may have on hand or undertake whether it be with the Contractor or others. Should the Subcontractor's financial condition change in any manner from that at the time of entering into this Agreement, it shall immediately notify the Contractor so that procedures may be instituted to help safeguard the performance by the Subcontractor hereunder.

The Contractor may, at any time, make inquiries as to the financial condition of the Subcontractor including, but not necessarily limited to, lower-tier subcontractors, suppliers, etc. that are supplying material and/or services to the project, any other creditors, and subcontractor's banker, Certified Public Accountant, and Surety. The Subcontractor, when requested, shall furnish copies of its financial statements (certified when available) to the Contractor and shall provide such other financial and credit information in the form the Contractor may request.

The Contractor may institute such financial and other measures provided elsewhere in this Agreement when, in Contractor's sole determination, the best interests of the project would be served thereby. Nothing in these paragraphs or in any actions taken by the Contractor hereunder shall in any way relieve the Subcontractor from its duties and responsibilities as provided elsewhere in the Agreement.

THE PARTIES HERETO DO HEREBY FURTHER AGREE AS FOLLOWS:

SECOND.        Contract Documents.
The following documents are by this reference made a part of this Subcontract, and these, together with the General Contract with Owner and all drawings and specifications issued for this project, constitute the entire Subcontract and are referred to collectively as the "Contract Documents":

> Project Drawings dated February 14, 2003
> Project Specifications dated February 14, 2003
> Subsurface and Geotech Reports
> General Contract with Owner
> GSA Volume I Sections A-M
> Project Schedule
> General Decision CA010029 Dated 12/28/01
> PBS Order 3490.1

This Subcontractor's attention is directed to PBS Order 3490.1 dated March 8, 2002 for the procedure associated with document security for sensitive but unclassified paper and electronic building information. This Subcontractor and their lower tier subcontractors and suppliers shall comply with requirements of PBS Order 3490.1.

The Contractor shall have the benefit of all rights, remedies, and redress against the Subcontractor, which the Owner, by the Contract Documents, has against the Contractor. To the extent that the provisions of the Contract Documents between the Owner and the Contractor apply to the specific work of the Subcontractor as defined in this Agreement, the Contractor shall assume toward the Subcontractor all the obligations and responsibilities that the Owner, by those documents, assumes toward the Contractor. In the event of any inconsistency or conflict between the terms and conditions of this Subcontract and any other Contract Document listed above, the terms and conditions of this Subcontract shall govern.

THIRD.        Execution of Work.
The Subcontractor will promptly begin said work as soon as it is notified by the Contractor that the ground is clear or the structure far enough advanced to allow the beginning of the portion included hereunder, and Subcontractor will carry forward and complete said work as rapidly as said Contractor may judge that the progress of the structure will permit, unless detained by the Contractor or other subcontractors in which event Subcontractor will within three (3) calendar days of the beginning of the delay so notify the Contractor in writing. If satisfied that said delay is caused by others than said Subcontractor hereunder, Contractor will allow additional time sufficient in the Contractor's judgment to make up the time so lost. This paragraph shall cover any extra work done or materials furnished under

FOURTH.        Contract Scheduling Requirements.
In accordance with the General Conditions of the General Contract, the Subcontractor shall provide the necessary scheduling input which shall meet the approval of the Contractor and which shall facilitate the development of the project schedule as mentioned in the Contract Documents. The Subcontractor shall include, in addition to normal work activity input, input which encompasses shop drawing approvals, delivery durations for important materials and/or equipment, resource loading (manpower, equipment, cost - labor/material), and logic relationships with other activities including

FOR THE PROJECT KNOWN AS:        GSA Federal Building, San Francisco
Subcontract Number 21058-129
GSA Contract No. GS-09P-02-KTC-0002
GSA Project No. NCA00049
COST CODE:  099000

11 of 23

physical and site restraints.    This input shall be completed and provided by the Subcontractor upon award of this Subcontract Agreement and at such other times as requested by the Contractor. This input shall be submitted using a precedence based CPM schedule utilizing the most recent version of P3 software. The Subcontractor's input shall become the basis for the development of the required schedule and in the updating thereof as required by the Owner and the Contractor.

Subcontractor, at Contractor's request, agrees to attend weekly meetings to maintain a three (3) week look ahead schedule. Subcontractor, at Contractor's request, agrees to attend progress scheduling meetings at least once per month in order to cooperate with the Contractor in:

1)    Changing the logic of the schedules to reflect the progress of the work;

2)    Developing a narrative for the reasons why logic changes were made;

3)    Updating the individual Subcontractor activities; and

4)    Integrating changed work into the schedules.

A schedule update will be distributed by the Contractor.    Subcontractor shall review each update and notify Contractor of any deviation contained in the update which was not agreed upon during the monthly schedule meeting.

The integrated schedule shall become the basis of this Subcontractor's work and the Subcontractor shall comply with it in all respects.  Subcontractor shall use its best efforts to diligently pursue its work in order to permit Contractor to meet the dates for Subcontractor's work as they relate to its own work and the work of others and to achieve the completion dates established in the schedule for the overall project. Subcontractor shall designate an individual with the responsibility and authorization to progress/revise the schedule and approve changes as required.

FIFTH.        Delay and Default.
The Subcontractor will furnish all supervision, labor, materials, tools, equipment, appliances, and accessories, including all necessary scaffolding, and prosecute said work with due diligence without delay, and will not in any manner, by delay or otherwise, interfere with the work of the Contractor or other subcontractors. Should the Contractor conclude that the Subcontractor is delaying said work by failure to prosecute the work with diligence; should the Subcontractor allow judgments to be obtained and stand against it; should Subcontractor become insolvent; should Subcontractor have a committee of creditors appointed for it; should Subcontractor go into receivership or bankruptcy; should Subcontractor fail to pay any person or firm that furnished material or supplied or performed labor in the prosecution or the work; or should Subcontractor fail to perform its work with due diligence; then, if said Subcontractor fails to remedy the situation in a period of three (3) calendar days after written notice is given to it by the Contractor, addressed to its last known address or posted on the project, the Contractor may declare the Subcontractor to be in default, seize and make use of the Subcontractors' tools and equipment, and take over in whole or in part and complete the work with Contractor's own staff, another subcontractor, or both, charging the cost of the same plus ten percent (10%) for overhead and ten percent (10%) for profit to the Subcontractor's account.  If, after the completion and acceptance of all the work on the project, there is anything left in the Subcontractor's account, that balance will be paid to the Subcontractor.  If, on the other hand, the expense of the Contractor completing the work is more than the balance due, the Subcontractor shall pay said amount to the Contractor.  In the event it becomes necessary for the Contractor to collect any deficiency from the Subcontractor by legal action, the Subcontractor agrees to defray all Contractors' reasonable attorney's fees and other court expenses in connection with such action.

SIXTH.        Indemnification for Delay.
Should said Subcontractor fail to begin, continue, and complete the work as herein provided and should the Contractor suffer or permit said Subcontractor to occupy more time than required under this Agreement, in that event, said Subcontractor hereby covenants and agrees to indemnify and save harmless the Contractor from any loss or damages which it may be compelled to make good to others including, but not limited to, the Owner of said project under or by virtue of the contract with the Owner, for or on account of delay in the completion thereof, insofar as said delay was caused by said Subcontractor.

SEVENTH.      Time of the Essence and Liquidated Damages.
It is expressly UNDERSTOOD AND AGREED by and between the parties hereto that time is and shall be considered the essence of the contract on the part of said Subcontractor, and, in the event that the Subcontractor shall fail in the performance of the work to be performed under this Subcontract by and at the time or times herein mentioned, referred to, or agreed to in the project schedule developed pursuant to Article Fourth, or the Subcontractor is otherwise responsible for the late completion of the project, and a time extension has not been issued either by the Owner or the Contractor, said Subcontractor shall pay unto said Contractor, as damages, all such actual damages and liquidated damages suffered by the Contractor by reason of such default; including, but not limited to, damages assessed by the Owner pursuant to the General Contract. The Contractor shall have the right to deduct

FOR THE PROJECT KNOWN AS:        GSA Federal Building, San Francisco
Subcontract Number 21058-129
GSA Contract No. GS-09P-02-KTC-0002
GSA Project No. NCA00049
COST CODE:  099000

12 of 23

from any monies otherwise due or to become due to said Subcontractor or to sue for and recover compensation or damages for the non-performance of this Subcontract at the time or times herein stipulated or provided for.

EIGHTH.                    Extension of Time.
When extension of time for strikes, fires, casualties, weather, or for any other reason beyond its control has been granted to the Contractor by the Owner or its representative as set forth in the General Contract, the same extension, to the extent applicable, shall be granted said Subcontractor; it being expressly agreed, however, that the Contractor shall not be liable to the Subcontractor for any claims associated with any such extension of time except to the extent and amount that the Contractor is actually paid therefore by the Owner  or others for the specific use and payment of Subcontractor's claim.  The Contractor merely acts as a conduit to provide the Subcontractor with contractual privity for access to the Owner or others to seek reimbursement for damages caused by such an extension of time.

submittals or in securing approval of same when such submittals are not properly prepared for approval of the Owner.

NINTH.                    Claims.
If the Subcontractor is delayed in the prosecution of its work due to the acts of the Owner and/or its agents, other independent contractors of the Owner, the Contractor, or the Contractor's other subcontractors and the Subcontractor suffers delay, acceleration, loss of efficiency, extended overhead, or any other type of damages therefrom, the Contractor agrees to transmit to the Owner, other subcontractors, or other entity any such claims submitted to it by the Subcontractor.  Likewise, if the Subcontractor has any other type of claim for damages including, but not limited to, differing site conditions, changes in scope of work, disruption, loss of efficiency, cumulative impact of change orders, payment delay, or any other type of damages caused by the Owner, other independent contractors of the Owner, the Contractor, the Contractor's other subcontractors, or any other entity, the Contractor agrees to transmit to the Owner, other subcontractors, or other entity any such claims submitted to it by the Subcontractor.

The Contractor under this Article merely acts as a conduit to provide the Subcontractor with contractual privity for access to the Owner, other subcontractors, or other entity to seek reimbursement for damages incurred for such delays or other claims.  It is agreed that in no event will the Contractor be liable for Subcontractor's claims for such damages except to the extent and amount that the Contractor is actually paid therefore by the Owner, other subcontractors, or other entity for the specific use and payment of Subcontractor's claim unless (a) the Subcontractor promptly and properly notifies the Contractor of a delay or other claim caused by the Contractor or other subcontractors under the control of the Contractor in writing (see Article Third, Execution of Work) and (b) the Contractor fails to correct promptly a delay or element of another claim caused solely by the Contractor or fails to transmit the Subcontractor's notification to the Owner, other subcontractors, or other entity causing the delay or other claim within seven (7) calendar days of such a notification.  The Owner's decision regarding Owner related claims and the Contractor's decision regarding all other such claims will be final and binding upon the Subcontractor subject to the disputes provisions of this Subcontract.

TENTH.                    Notices.
Unless otherwise provided in the paragraphs above, including, but not limited to Article Seventh, Subcontractor agrees to follow the procedures set forth in the General Contract and to give to Contractor each and every notice, statement, and claim of any character or form in the same manner and in at least seven (7) calendar days before the end of the time period required by said General Contract for the Contractor to give notice so that any claim may be considered by the Owner.  Failure to give notice which results in the Owner denying Subcontractor's claim shall forever waive said claim against the Contractor unless the failure to give notice is waived or extended by the Owner.  Failure to provide such notice, statement, or claim in conformance with the above referenced conditions and clauses will serve to

ELEVENTH.                    Submittals.
Submission of shop drawings, literature, and samples shall be made by the Subcontractor to the Contractor in strict conformance with the General Contract with the Owner, see Section 01330 of the General Contract.  A minimum of seven (7) copies of catalog cuts, schedules, data sheets, etc. shall be submitted for approval.  Samples are required for approval in the quantity and type specified in the applicable technical specifications.  Shop drawings are to be submitted as follows:  one (1) reproducible transparency and three (3) opaque prints.  Upon return of the approved transparency or literature to this Subcontractor, it shall print from the approved submittal a minimum of seven (7) copies for Contractor's use and return same to the Contractor's office.

TWELFTH.                    Cooperation.
The Subcontractor and its subcontractors, if any, shall cooperate with Contractor and other subcontractors on the premises and shall so carry on their work so that other cooperating subcontractors shall not be hindered, delayed, or interfered with in the progress of their work and so that all of such work shall be a finished and complete job of its kind.

FOR THE PROJECT KNOWN AS:

GSA Federal Building, San Francisco
Subcontract Number 21058-129
GSA Contract No. GS-09P-02-KTC-0002
GSA Project No. NCA00049
COST CODE:  099000

13 of 23

THIRTEENTH.          Coordination and Interferences.

The Subcontractor shall coordinate its work with that of others in order that interferences between mechanical, electrical, architectural, structural, mechanization, and other systems will be avoided. In case interference develops, the Owner and/or Contractor will determine which equipment shall be relocated regardless of which was first installed, and the Subcontractor shall be held fully responsible for the cost of relocation. Where installations are complex, coordinating layouts of work shall be prepared by this Subcontractor and shall be submitted for approval in addition to all other coordination drawings as required by the Contract Documents. Further, Subcontractor shall be required to furnish any additional information or documents for the purpose of coordination that the Contractor may require so as to facilitate the preparation of project coordination drawings and information.

FOURTEENTH.          Changes.

Without invalidating this Subcontract, the Contractor may add to or reduce the work to be performed hereunder. No extra work or changes from plans and specifications under this Subcontract will be recognized or paid for unless agreed to in writing before the extra work is started or the changes made. Said written order shall specify in detail the extra work or changes desired and the price to be paid or the amount to be deducted should said change decrease the amount to be paid hereunder. All such orders must be signed by an authorized representative of the Contractor. It is understood and agreed that any claims for extras demanded by the Subcontractor arising from omissions and/or discrepancies in the plans or specifications prepared by the Owner shall not be binding upon the Contractor or honored by the Contractor except to the extent approved and the extent actually paid for by the Owner. Costs for all such extra work or changes by either party shall be billed prior to and payable in the next current payment (as set forth in Article First of this Subcontract Agreement) following completion of such work and approval and payment by the Owner to the Contractor. In case the parties are unable to agree on the amount of the addition to or the reduction from the contract price, the Subcontractor shall nevertheless proceed with the work and the determination of the amount of such addition or reduction by the Owner as provided in the General Contract between the Owner and the Contractor shall be binding on the Subcontractor subject to the disputes provisions of this Subcontract.

FIFTEENTH.          Interpretation of Documents.

Should any dispute arise between the parties respecting the true construction of the Plans, Specifications, and Contract Requirements, the decision of the Owner or its representative as set forth in the General Contract shall be final subject to the disputes provisions of this Subcontract. In the event of any such dispute, the Subcontractor shall proceed, without interruption, with the work provided for herein, in such manner as may be directed by the Contractor, pending the decision of the Owner or its representative as set forth in the General Contract. It is further agreed that in the event of any dispute arising between the Subcontractor and the Contractor as to the scope and/or intent of this Subcontract, the Subcontractor shall proceed with its work without interruption pending settlement thereof.

SIXTEENTH.          Inspection.

The Subcontractor shall provide sufficient, safe, and proper facilities at all times for the inspection of the work by the Owner, the Contractor, or its authorized representatives. Subcontractor shall at once, and without extra time or pay, remove all materials and take down and rebuild all portions of the work condemned by the Owner or Contractor upon receiving notice in writing of such condemnation.

SEVENTEENTH.          Warranty.

Subcontractor warrants and guarantees all work in full accordance with the General Conditions of the General Contract, the other warranty and guarantee, tests and inspections, corrections, and removal or acceptance of defective work sections, and all other applicable sections of the Contract Documents.

EIGHTEENTH.          Equal Opportunity.

Contractor is a federal contractor affirmative action - equal opportunity employer. As such, it is Contractor's policy that employment decisions be made without regard to race, religion, creed, sex, national origin, age, veteran status, and non-job related disability.

During the performance of this Agreement, the Subcontractor agrees not to discriminate against any employee or applicant for employment because of race, color, religion, creed, sex, or national origin. The Subcontractor will take affirmative action to insure that applicants are employed without regard to their race, religion, creed, sex, national origin, age, veteran status, and non-job related disability. The Subcontractor will comply with all provisions of The Civil Rights Act of 1991, The American with Disabilities Act of 1990, and Executive Order No. 11246 of September 24, 1965, including all amendments, updates, and modifications to this Executive Order, and relevant orders of the Secretary of Labor, including the regulations set forth in 41 CFR 60 and subparts thereof relating to employment of minorities, females, disabled workers, and disabled and vietnam era veterans.

Subcontractor shall employ minorities and females in its workforce according to the goals and timetables established by the Federal government and will exercise every good faith effort, as defined by 41 CFR 60, to achieve minority participation of 25.8 percent (25.8%) by craft and female participation of 6.9 percent (6.9%) by craft. Monthly submittals showing participation will be required. In addition, Subcontractor may be required to complete a "Certification for Utilization of Disadvantaged Business

FOR THE PROJECT KNOWN AS:

GSA Federal Building, San Francisco
Subcontract Number 21058-129
GSA Contract No. GS-09P-02-KTC-0002
GSA Project No. NCA00049
COST CODE: 099000

14 of 23

Enterprises" which validates a subcontractor's efforts to secure participation from such firms. These provisions require that good faith efforts be extended to achieve 5 percent (5%) DBE participation. In addition, the General Services Administration has established national subcontracting goals of 40 Percent (40%) for Small Businesses, 5 Percent (5%) for Small Women-Owned Businesses, 3 Percent (3%) for Small Veteran-Owned Businesses, 2 Percent (2%) for HUB Zone Small Businesses, and 1% for Small Service Disabled Veteran Owned Businesses.

The Subcontractor agrees to submit such periodic reports and documents in any studies or surveys as may be required by the contracting agency or the Small Business Administration in order to determine the extent of compliance by the Contractor with the Subcontracting Plan. The Subcontractors will submit Standard Form 294 (Subcontracting Report for Individual Contracts) and Standard Form 295 (Summary Subcontracting Report).

NINETEENTH.        Labor.
(a)  The Subcontractor agrees that in the preparation of the material and the performance of its work, as provided herein, it will employ only such workers as will work in harmony with the other workers employed by the Contractor or other Subcontractors, and the Subcontractor further agrees that it will, at the request of the Contractor, forthwith discharge and remove from the premises to which this Subcontract applies or relates any person designated by the Contractor. The right of the Contractor to request the discharge of any workers employed by the Subcontractor shall not be construed to constitute the Contractor as the employer of any workers employed by the Subcontractor.

(b)  The Subcontractor agrees to adhere strictly to all laws and to all regulations in connection with employment of labor, including, but not limited to, those contained in the specifications, bulletins, and all subsequent amendments and modifications thereof, which are part of the General Contract with the Owner and which form a part of this Subcontract. The Subcontractor further agrees that any penalty imposed upon the Contractor due to any infraction of these requirements or violations thereof by Subcontractor shall be charged to and borne by the Subcontractor.

TWENTIETH.        Project Labor Agreements.
Subcontractor agrees to become signatory and to be bound by any project labor agreement entered into by the Contractor for this project. The Subcontractor further agrees that it will employ union labor of appropriate jurisdiction in the performance of this work, unless specific permission to the contrary is given by the Contractor. If employing union labor, Subcontractor agrees to be bound by and abide by the Rules, Regulations, and Procedures of the National Joint Board for Settlement of Jurisdictional Disputes in the Building and Construction Industry in the assignment of work and/or settling jurisdictional disputes on work to be done at the project site.

TWENTY-FIRST.        Wage Rates.
Subcontractor is required to abide by applicable Federal, State and/or Local laws, rules, ordinances or regulations dealing with wage rates and conditions of employment, including, but not limited to, the Prevailing Wage Act and all provisions cited in the General Contract. Subcontractor's failure to abide by any such provisions shall be a material breach of the Subcontract Agreement which shall justify the withholding of funds from the Subcontractor, as well as entitle the Contractor to terminate this Subcontract Agreement. Subcontractor shall submit weekly-certified payrolls to Contractor, which shall evidence compliance with the prevailing minimum wage rate schedule.

The Subcontractor will, at all times, pay union labor the schedule of wages as fixed from time to time by the respective unions governing the class of laborers employed and agrees that any increase in said schedule of wages during the life of this subcontract shall be borne by the Subcontractor. Subcontractor further agrees that all wages paid pursuant to union agreements shall at all times satisfy the requirements of the Contract Documents.

TWENTY-SECOND.        Taxes and Laws.
The Subcontractor assumes every responsibility for and agrees to pay all assessments, contributions, taxes, etc. required by the Federal Social Security Act and any Social Security Statutes of the State or States in which it may operate, now in force or which may be enacted, and generally to comply with all rules and regulations set forth thereunder. Subcontractor shall pay directly to all governing bodies all taxes (including any income, sales, occupation, use and all other taxes) in connection with its work that the Subcontractor or the Contractor is required to pay or withhold.

If the Subcontractor fails to make such payments, including but not limited to employee taxes required to be withheld by Subcontractor, Contractor may make such payments, using IRS Form 4219 in the case of employee taxes, and deduct the amount of such payments and all costs related thereto from the Subcontract amount. Contractor shall not be obligated to exercise its right to make such payments. This provision is not intended to and does not make any third person including governmental agencies a third party beneficiary of this Subcontract Agreement or any portion thereof.

Subcontractor shall comply with all Federal, State, and Local Laws and Regulations applicable to said work. In the event that the Subcontractor is found to have violated any Federal or state statute, executive order, ordinance, public building or public works contract provision or contract specification

FOR THE PROJECT KNOWN AS:

GSA Federal Building, San Francisco
Subcontract Number 21098-129
GSA Contract No. GS-09P-02-KTC-0002
GSA Project No. NCA00049
COST CODE:  099000

15 of 23

relating to discrimination in employment or fair employment practices by the appropriate commission, contract authority, or governmental agency which is charged with responsibility of enforcement of such statute, executive order, ordinance, or contract provision or contract specification, the Subcontractor shall be considered in default under this Agreement and if, after written notice from the Contractor, the Subcontractor shall fail to correct the violation within forty-eight (48) hours, the Contractor shall have the right to terminate this Agreement for such default.

The Subcontractor agrees to indemnify and save the Contractor harmless against any expenses, loss, or liability of any kind incurred by the Contractor by reason of the violation by the Subcontractor of any federal or state statute, federal executive order, city ordinance, public building or public works contract provision or contract specification relating to discrimination in employment or fair employment practices or any other legal requirement of law or regulation applying to Subcontractor's work. This provision shall be included in any contract let by the Subcontractor of any work covered by this Agreement.

TWENTY-THIRD.    Public Authorities and Permits.

The Subcontractor shall obey all laws and regulations and shall secure and pay for all licenses and permits that it may require to comply fully with all laws, ordinances, and regulations of the proper Public Authorities in connection with the performance of this work.   The Subcontractor shall be responsible for all damages and penalties and shall indemnify and save harmless Contractor and Owner from and against all damages, penalties, and liability which may arise out of the failure of the Subcontractor to obey all laws and regulations or failure to secure and pay for any such licenses and permits or failure to comply fully with any and all applicable laws, ordinances, and regulations.

TWENTY-FOURTH.    Safety.

The Subcontractor is solely responsible for the health and safety of its employees, agents, subcontractors, and other persons on and adjacent to the Work Site. The Subcontractor, however, shall take all necessary and prudent safety precautions with respect to its work and shall comply, at Subcontractor's cost, with ALL safety policies, programs and measures initiated by the Contractor and the Owner (including substance abuse testing) and with all applicable laws, ordinances, rules, regulations and orders of any public authority for the safety of persons or property, including, but not limited to, the Code of Federal Regulations Title 29, Part 1926 and applicable portions of CFR 29, Part 1910 Titled "Occupational Safety and Health Standards."   Subcontractor's work shall be carried out and completed strictly in accordance with the Contractor's Safety Program, which Subcontractor warrants that it has independently investigated and understands. A copy of said Safety Plan is on file at the Contractor's Office and has been inspected by the Subcontractor (A copy of the Safety Plan is available upon request). The Subcontractor shall submit for approval their substance abuse testing program. In the absence of such a program, the Subcontractor agrees to comply with the Contractor's Program.

It is also agreed that the Subcontractor shall be responsible for supplying and implementing a safety program which provides for complete fall protection for all of its workers (including its subcontractors, erectors, agents, etc.) exposed to falls above six (6) feet.   The Subcontractor is responsible for ensuring that this and all other safety policies/guidelines are incorporated into any subcontracts, or lower tier contracts, which it may enter into on this Project.

The Subcontractor shall assign a competent safety representative (a) who is certified both in first aid and CPR, (b) who is experienced and capable of identifying existing and predictable hazards in the surroundings or working conditions which are unsanitary, hazardous, or dangerous to employees and the public, and (c) who has authorization to take immediate corrective measures to insure the safety of the Subcontractor's work areas. The Subcontractor's safety representative shall submit a site-specific safety plan to the Contractor for review prior to the commencement of any work activities on the project site. Subcontractor shall report within one (1) day to the Contractor any injury to any of the Subcontractor's employees including any injury sustained by an employee of the Subcontractor's subcontractors. In addition, an OSHA AND/OR CAL/OSHA Form No. 101, "Supplemental Record of Occupational Injury and Illnesses" or equivalent and an accident investigation report shall be provided to the contractor in the event of an injury to an employee employed under this Subcontract.

As an expert in the Subcontractor's field of work, the Subcontractor's supervisor and safety personnel have sole control over all requirements for doing the work safely, and the Contractor is not responsible in any manner for the safety of the Subcontractor's work. If the Subcontractor fails to correct unsafe procedures, acts, or conditions within a twenty-four (24) hours of notification by the Contractor or any public authority, however, Contractor may (but has no contractual obligation to do so) correct the unsafe practice and backcharge the Subcontractor for these costs plus ten percent (10%) for overhead, ten percent (10%) for profit, and twenty percent (20%) for a "safety premium". This specifically includes but is not limited to the clean up of Subcontractor's construction debris and the replacement of standard railings or barricades removed by Subcontractor's employees. Conditions which constitute "imminent danger" to any employee will result in an immediate stoppage of work. No extension of time or additional compensation will be granted as a result of any stop order so issued. Repeated failures to correct unsafe practices will result in default and termination of this Subcontract pursuant to Articles Fifth and Thirty-Third without any further notice to the Subcontractor. In the event the Contractor receives a penalty from OSHA AND/OR CAL/OSHA as a result of a violation of OSHA AND/OR CAL/OSHA Standards by the

FOR THE PROJECT KNOWN AS:

GSA Federal Building, San Francisco
Subcontract Number 21058-129
GSA Contract No. GS-05P-02-KTC-0002
GSA Project No. NCN00049
COST CODE: 099000

16 of 23

Subcontractor and Contractor is cited under the multi-employer worksite rule, Subcontractor agrees to protect, defend, indemnify, and hold harmless Contractor from the imposition of any fines and/or penalties by OSHA AND/OR CAL/OSHA.

TWENTY-FIFTH        Insurance.

Using an insurance Company satisfactory to the Contractor, the Subcontractor shall provide adequate Worker's Compensation and Employer's Liability insurance covering the Subcontractor's employees working on the Project and will provide General Liability, Umbrella Liability, and Automobile Liability Insurance covering the Owner, Contractor, the Architect/Engineer, the Construction Manager, and any of their respective employees and agents (the "Additional Insureds"), and the general public in accordance with all insurance requirements of the General Contract and the provisions contained herein, whichever are more stringent.

The obligations of the Subcontractor shall be to protect and to indemnify the Contractor, the Subcontractor and the Additional Insureds from all risks and/or occurrences that may arise or result, directly or indirectly, from the Subcontractor's work or presence on the jobsite and all risks of injury to Subcontractor's employees, sub-subcontractors' employees, and other agents. This obligation is in addition to and shall not limit in any way the obligations assumed by the Subcontractor in Article Twenty-Sixth or elsewhere in this Subcontract Agreement. This obligation shall not be avoided by allegations of contributory or sole acts, failure to act, omissions, negligence or fault of the Additional Insureds. Each policy of insurance shall waive subrogation against the Additional Insureds. As such, each policy of insurance provided for herein, except Worker's Compensation, shall name the Contractor, Owner, the Architect/Engineer, and the Construction Manager as an additional insured under the policy, and each policy of insurance provided for herein shall be primary with no right of contribution against the Contractor, Owner, the Architect/Engineer, the Construction Manager or their insurers.

The policies described above shall be written on a comprehensive form and shall conform to the laws of the State in which the job is located. All of the insurance specified herein shall be taken out, maintained, and paid for by the Subcontractor as part of the contract price specified in Article First.

Worker's Compensation insurance shall be in accordance with statutory requirements and Employer's Liability insurance shall be supplied with minimum limits of One Million Dollars ($1,000,000) each accident, One Million Dollars ($1,000,000) disease - policy limit, and One Million Dollars ($1,000,000) disease - each employee.

The General Liability insurance shall include the following coverages:

(1)    Broad Form Property Damage, including Completed Operations;
(2)    The deletion of XCU Exclusions when applicable to Subcontractor's operations;
(3)    Blanket Contractual Liability;
(4)    Personal Injury Coverage that includes
       (a)    false arrest, detention or imprisonment, or malicious prosecution,
       (b)    liable, slander, defamation, or violation of right of privacy, and
       (c)    wrongful entry or eviction or other evasion of right of private occupancy; and
(5)    Contractor's Protective Liability if any of the work is sublet; and

The General Liability Policy shall be written at a combined minimum limit of Two Million Dollars ($2,000,000) each occurrence, Personal Injury and Advertising Injury minimum limit of Two Million Dollars ($2,000,000) each occurrence, Products-Completed Operations minimum policy aggregate of Three Million Dollars ($3,000,000) and a separate General aggregate of Three Million Dollars ($3,000,000), applied on a "per project" basis. On any, each and all trucks, automobiles or vehicles owned, hired, and non-owned which are used by the Subcontractor in the performance of the work, the Subcontractor shall provide Automobile Liability insurance with a minimum single limit of liability of One Million Dollars ($1,000,000) Bodily Injury and Property Damage combined.

The Umbrella Liability Policy shall be written at a limit of Five Million Dollars ($5,000,000) and apply excess over the Employer's Liability, General Liability, and Automobile Liability primary policies. This policy shall be written to provide policy limits on a per project aggregate basis.

Before any of the Subcontractor's employees, sub-subcontractors' employees, and other agents do any of the work on the premises under control of the Contractor, Subcontractor shall furnish the Contractor with the Insurance Company's certificate that the required coverages have been provided and each certificate shall contain a provision whereby the Insurance Company shall notify the Contractor thirty (30) days prior to the expiration of any coverages contained thereon. The certificates shall contain the date when each coverage expires and a specific confirmation that the Employer's Liability, General Liability and Automotive Liability policies (a) name the Contractor, Owner, the Architect/Engineer, and the Construction Manager as additional insureds and (b) meet the "primary insurance" and "per jobsite aggregate" requirements detailed above. The Subcontractor agrees that the coverage shall not be allowed to expire until the entire work is completed and accepted.

FOR THE PROJECT KNOWN AS:

GSA Federal Building, San Francisco
Subcontract Number 31058-129
GSA Contract No. GS-09P-02-KTC-0002
GSA Project No. NCA00049
COST CODE:  099000

17 of 23

The Subcontractor shall also carry such additional insurance in connection with the performance of the work hereunder as Contractor or Owner may specify. Subcontractor will be compensated for such additional insurance provided it is purchased through an Insurance Company satisfactory to the Contractor. Subcontractor shall promptly furnish to the Contractor certificates evidencing any such additional insurance coverage.

If a loss to the Contractor or Owner caused by the Subcontractor is covered by a Builders' Risk insurance policy taken out by the Contractor or the Owner, the Subcontractor shall pay the deductible sum for that loss to the Contractor or the Owner. Any deductible amounts paid by Subcontractor are not subject to an annual aggregate or cap.

TWENTY-SIXTH.    General Indemnification.
The Subcontractor shall protect, indemnify, hold harmless, and defend the Contractor , the Owner, the Architect/Engineer, the Construction Manager, and any of their respective employees and agents (the "Indemnitees") against any and all claims, causes of action, suits, losses, costs, or damages, including attorneys' fees, resulting from the acts, failure to act, omissions, negligence, or fault of the Subcontractor, those employed by it, or its agents, whether or not said claim, cause of action, suit, loss, cost, or damage is alleged to be caused in part by any act, failure to act, omission, negligence, or fault of any of the Indemnitees or their employees, and Subcontractor shall bear any expense which any of the Indemnitees may have by reason thereof, or on account of being charged with such claim, cause of action, suit, loss, cost or damage, unless such claim, cause of action, suit, loss, cost, or damage is solely caused by the Indemnitee's sole act, failure to act, omission, negligence, or fault.

This general indemnification obligation is in addition to, and not a limit on, the insurance obligations of the Subcontractor. If there are any injuries to persons or damages to property that are unsettled when the work herein provided for is finished and for which coverage has been denied by Subcontractor's insurer, final payment between the Contractor and Subcontractor shall be deferred until such claims are settled or suitable special indemnity acceptable to the Contractor is provided by the Subcontractor. This general indemnification obligation shall apply particularly, but not exclusively, to the claims of any other subcontractor against any of the Indemnitees for the acts, failure to act, omissions, negligence, or fault of this Subcontractor, and this Subcontractor shall have no claim against the Indemnitees for the acts, failure to act, omissions, negligence, or fault of any other subcontractor except as provided for in Article Ninth.

In any and all claims by any employee of the Subcontractor, anyone directly or indirectly employed by it, or anyone for whose acts Subcontractor may be liable, against any of the Indemnitee's, or any of their agents or employees, the indemnification obligation under this Article Twenty-Sixth shall not be limited in any way by any limitation on the amount or type of damages or by the compensation or benefits payable by or for the Subcontractor under workers' or workmen's compensation acts, disability benefit acts, or other employee benefit acts.

TWENTY-SEVENTH.    Gifts, Exchanges, Rentals, or Loans.
In the event that the Contractor gives, exchanges, rents, or loans material, scaffolding, equipment, machines, and/or tools to the Subcontractor, and whether or not such gift, exchange, rental or loan includes the providing of Contractor's operator or other personnel, the Subcontractor hereby agrees to make no claim whatsoever against the Contractor for any personal injuries or property damages caused in the course of carrying out such a gift, exchange, rental, or loan. It is further understood and agreed that in the event that such material, scaffolding, equipment, machines, and/or tools are used, handled, or operated by employees or agents of Contractor, such operators or other personnel, for the purpose of this Agreement and for such purpose only, shall be considered subject to the direction and control of Subcontractor so that the Subcontractor, as between the Contractor and Subcontractor, shall be considered as being liable for any and all acts, failure to act, omissions, negligence, or fault of such operators or other personnel.

The Subcontractor hereby agrees to protect, indemnify, hold harmless, and defend the Contractor against any and all claims, causes of action, suits, losses, costs, or damages, including attorneys' fees, suffered by anyone arising from the Contractor's gift, exchange, rental, or loan of any such material, scaffolding, equipment, machines, and/or tools. This indemnification shall apply regardless of whether or not such personal injuries or property damages may be the result of the acts, failure to act, omissions, negligence, or fault, in whole or in part, of the Contractor or its employees or otherwise due to any act, failure to act, omission, negligence, or fault of Contractor or its employees.

TWENTY-EIGHTH.    Patent or Copyright Infringement.
The Subcontractor hereby covenants and agrees to protect, indemnify, hold harmless, and defend the Contractor from any and all manner of claims or suits for infringement of patents or copyrights or violation of patent rights associated or related in any way to the Subcontractor's work under this Agreement, including all costs and expenses to which the Contractor may be put in investigating or defending any claims or actions that may arise under this clause of the Subcontract.

TWENTY-NINTH.    Accounting.

FOR THE PROJECT KNOWN AS:



GSA Federal Building, San Francisco
Subcontract Number 21058-129
GSA Contract No. GS-09P-02-KTC-0002
GSA Project No. NCA00049
COST CODE:  099000

18 of 23

Subcontractor shall prepare a monthly "draft" invoice to be reviewed and approved by the Contractor Field Office and/or Owner and shall submit this draft to the Contractor at least five (5) working days prior to the due date for the original invoice. Upon review and approval, Subcontractor shall prepare original invoice.

The Subcontractor's original invoices shall be submitted to Contractor's Accounting Department in Pittsburgh, Pennsylvania before the 25th of the month, with a copy to Contractor's Field Office. Invoices arriving later than the 25th of the month shall be held for the following requisition. Subcontractor will refer to the Subcontract Agreement Number referenced on the first page of this Agreement for the convenience of our Accounting Department when submitting invoices relative to the aforesaid project. Invoices for this Subcontract will not be allowed until material receiving reports have been filled out and forwarded to Contractor.

Prior to receipt of any progress payment, the Subcontractor shall execute and deliver to the Contractor Exhibit "A" entitled "Requisition, Waiver and Release of Lien", Exhibit "B" entitled "Subcontractor's Estimate", Exhibit "C" entitled "Affidavit", Exhibit "C-1" entitled "Subcontractor's Detail Lower-Tier Orders" and Exhibit "D" entitled "Lower-Tier Subcontractor, Materialmen, Equipment Lessors, Waiver of Lien and Release", all of which forms are attached and made a part of this Subcontract Agreement. Exhibits "C, C-1 and D" shall be required at the discretion of the Contractor.

If for any reason the Contractor deems it necessary under the terms and conditions of this Agreement to withhold from the Subcontractor money retained or any other money claimed by the Subcontractor, then the Contractor shall not be liable for payment of interest on said money. This withholding shall include, but shall not be limited to, money withheld because of Subcontractor's refusal to sign Exhibits "A", "B", or "C", by incomplete or unsatisfactory work, by disputed claims, or by claims of unpaid lower-tier subcontractors or suppliers.

Should the Contractor make advance or late payments to the Subcontractor or payments otherwise at variance with the terms and provisions of this Subcontract, the Contractor's rights and remedies under this Subcontract, and under any bond given to the Contractor in pursuance of the requirements of this Subcontract, shall in no way be impaired or prejudiced.

Contractor may retain and use any amounts due and owing to Subcontractor under this Subcontract to offset invoices, backcharges, charges or any other amount due Contractor under this Subcontract or arising out of Subcontractor's performance on this Project. Additionally, if Subcontractor has other contact(s) with the Contractor or affiliates of Contractor, Contractor may retain and use amounts due and owing to Subcontractor from the performance of this Subcontract to offset any invoices, backcharges, charges or any other amount due Contractor or Contractor's affiliates on such other contract(s).

THIRTIETH.    Financial Disclosure.
Subcontractor expressly agrees to provide financial and/or accounting information reasonably requested by Contractor for analysis and verification of invoices and credit and for verification of payments by Subcontractor on account of orders made to perform the work hereunder.

THIRTY-FIRST.    Investigation of Claims.
If a claim is made against the Contractor by any person, firm, or corporation for labor, material, equipment, or services furnished to said Subcontractor in connection with this Subcontract, the Contractor shall have the right to employ its representative to investigate such claim and to charge all expenses of such investigation to the Subcontractor. The Subcontractor further agrees, if any suit is brought against the Contractor and its sureties by any person, firm, or corporation on account of any claim for labor, materials, equipment, or services furnished or alleged to have been furnished to said Subcontractor in connection with this Subcontract, that the Contractor shall be permitted to employ its own counsel to defend such suit and that Subcontractor shall repay the Contractor for such counsel fees and all other costs and expenses to which the Contractor may be put in defense of such suit.

THIRTY-SECOND.    Payment of Subcontractor's Obligations.
In the event that the Subcontractor fails to pay and discharge when due any bills of any kind or nature whatsoever incurred by said Subcontractor in fulfillment of this Subcontract, which bills in the opinion of the Contractor are proper, the Contractor may (at its option, but it is to be specifically understood that the Contractor is not compelled to do so) and is hereby authorized to pay such bills. The Subcontractor hereby specifically appoints the Contractor as its lawful agent and attorney-in-fact to pay and discharge the aforementioned bills and to deduct the amount of such bills from any estimate due or to become due the Subcontractor, as well as any expense incurred in the payment of said bills, including interest, and the Subcontractor hereby empowers the Contractor as the agent and attorney-in-fact of the Subcontractor to exercise Contractor's best judgment in determining the validity of such bills, the Subcontractor hereby specifically waiving any right of redress or recovery against the Contractor by reason of any act of the Contractor while acting as agent and attorney-in-fact of the Subcontractor.

In addition to the foregoing, the Subcontractor hereby agrees to permit the Contractor to issue joint payment checks to the Subcontractor and any of the Subcontractor's equipment lessors, material

FOR THE PROJECT KNOWN AS:

GSA Federal Building, San Francisco
Subcontract Number 21058-129
GSA Contract No. GS-09P-02-KTC-0002
GSA Project No. NCA00049
COST CODE:  099000

19 of 23



suppliers, or anyone else to whom the Subcontractor owes money for this particular project. The Contractor will not be under any obligation, however, to issue joint payment checks, but may do so in the event that there is a reasonable likelihood that such obligations of the Subcontractor, as described above, may not be timely paid by the Subcontractor and/or could become the obligation of the Contractor under any surety bond issued by the Contractor or under the applicable mechanic's lien law.

Should the Contractor pay such bills in an amount in excess of any estimates due or to become due to the Subcontractor, then the Subcontractor shall pay the Contractor any such excess, including such expense and interest, if any, and such payment by the Contractor shall in no way prejudice or impair Contractor's rights and remedies under this Subcontract and under any bond given in pursuance of the requirements of this project.

The Subcontractor shall protect, indemnify, defend and hold harmless the Contractor from Subcontractor's failure to properly pay any laborer, supplier, subcontractor, and/or equipment lessor for work, materials, and/or equipment supplied to the project.

THIRTY-THIRD.          Termination or Suspension.
The Contractor may terminate or suspend this Subcontract in whole or, from time to time, in part for the default of the Subcontractor or for the convenience of the Contractor. In the event of the termination or suspension of the Contract between the Contractor and the Owner, this Subcontract shall also be terminated or suspended. In any termination, the Contractor shall be liable only for acceptable labor and material furnished up to the date of the receipt of notice of such termination and shall not be liable for any loss of anticipated profits on labor and material not yet furnished. The Subcontractor further agrees that it has thoroughly familiarized itself with the General Contract, including all Attachments and Exhibits, between the Contractor and the Owner and agrees to be bound in accordance with the terms of these Contract Documents, insofar as is applicable to the work of the Subcontractor, and to give the Contractor the same power and rights as regards terminating (whether for default or convenience) or suspending this Subcontract that the Owner may exercise over the Contractor under any provisions of the General Contract.

THIRTY-FOURTH.     Waiver of Liens, Final Payment & Release of Claims.
Subcontractor hereby waives and relinquishes the right to have, file, or maintain a mechanic's lien or claim for or on account of the work done or materials furnished by it under this Subcontract. Furthermore, if the General Contract with the Owner is a no-lien agreement that includes a waiver of liens form to be completed by the Contractor, Subcontractor shall also execute and submit this form to the Contractor before the commencement of any work activities on the project site. Prior to receipt of final payment, the Subcontractor shall be required to execute the following forms: Exhibit "A", "Requisition, Waiver and Release", checking the "final" block; Exhibit "C", "Subcontractor's Affidavit"; Exhibit "C-1", "Subcontractor's Detail Lower Tier Orders"; and Exhibit "D", "Lower Tier Subcontractor, Materialmen, Equipment Lessors, Waiver of Lien and Release", checking the "final" block, from any and all lower tier entities as Contractor may require. All the above referenced forms are attached hereto and made a part hereof.

THIRTY-FIFTH.          Special Conditions.
(a)       Bonus. Unless otherwise stated in this Subcontract, the Contractor reserves the right to require the Subcontractor to furnish Performance and Payment Bonds at any time during the duration of this Subcontract Agreement. If the Contractor requires the Subcontractor to furnish Performance and Payment Bonds under the provisions of this subparagraph, the Contractor will pay for the customary premiums for such bonds directly to Subcontractor's surety. The premium expense shall be included in Subcontractor's price.

(b)       Survey and Dimensions. Subcontractor shall be responsible for its own survey layout from one bench and line, i.e., coordinates, provided by Contractor in accordance with the Contract Documents. No work may proceed until Subcontractor has checked and verified all dimensions shown on Contract Documents and advised all entities engaged in the work of final dimensions to be used.

(c)       Existing Conditions. Subcontractor must assume all risks pertaining to existing site conditions and access to the site as provided in the General Contract with the Owner.

(d)       Laydown. The Subcontractor shall at its own expense provide its own space for storage, laydown, etc., beyond the space designated by Contractor within the space allocated by the Owner which must be shared by all subcontractors as directed by the Contractor.

(e)       Temporary Light. In the event that a temporary lightman is required while the Subcontractor is working premium time or using a hoist on premium time, the Subcontractor will be responsible for making the necessary arrangements with the electrical subcontractor for necessary temporary light service.

(f)       Clean-up. The Subcontractor promises to progressively and continually clean its work area and remove from the site all cuttings, cartons, and debris. The Subcontractor shall also perform all final clean-up required by applicable sections of the Contract Documents.

FOR THE PROJECT KNOWN AS:

GSA Federal Building, San Francisco
Subcontract Number 21058-129
GSA Contract No. GS-09P-02-KTC-0002
GSA Project No. NCA00049
COST CODE:  099000

20 of 23

If the Subcontractor is lax in its cleaning, the Contractor's superintendent will give notice to Subcontractor's field personnel and forward written notice to the Subcontractor's home office that the cleaning is not being kept current and will proceed to perform the Subcontractor's cleaning on a cost plus ten percent (10%) overhead, and ten percent (10%) profit basis within twenty-four (24) hours of notification. Furthermore, if Contractor determines that Subcontractor's clean-up is causing a safety hazard, Subcontractor will also be assessed the twenty percent (20%) "safety premium" pursuant to Article Twenty-Fourth.

(g)    Parking.  Subcontractor is responsible for its employee parking.  Any costs associated with the movement of its employees from parking areas to work areas will be by the Subcontractor.

(h)    Work Hours.  All subcontractors shall work the same standard work hours (unless the subcontractor is behind in its work and no time extension has been granted) as determined by the Contractor after Contractor consults with the subcontractors.

(i)    Testing.  This Subcontractor shall coordinate and cooperate with all other subcontractors in connection with design, erection, inspection, component or unit testing, start-up, systems tests, final tests, and acceptance tests.

(j)    Subcontractor's Changes.  If the Subcontractor changes any of the requirements or details in conjunction with its work or the work of others on this project, these changes must be specifically and timely brought to the Contractor's attention in letterform in addition to showing them on the shop drawings.  If this requirement is not complied with and changes so made cause additional cost to Contractor or others, the Subcontractor making such undocumented changes will be required to bear all additional costs.

(k)    As-Built Records.  Subcontractor shall keep records of its work as installed, including any changes or adjustments made from the Contract Documents; Subcontractor shall transcribe all such records on to a record set of drawings as the work progresses; and Subcontractor shall furnish a final record drawing set at the completion of its work.

(l)    Manufacturer's Information.   The Subcontractor shall also provide all required manufacturer's literature, operating and maintenance manuals, and training of Owner's personnel, including the presence of factory representatives, as required by the Contract Documents.

(m)    This Subcontractor shall abide by and insert a specific reference to the General Contract including a specific incorporation of the following clauses: *Davis-Bacon Act, Contract Work Hours and Safety Act -- Overtime Compensation, Apprentices and Trainees, Payrolls and Basic Records, Compliance with Copeland Act Requirements, Withholding of Funds, Subcontracts (Labor Standards), Contract Termination -- Debarment, Disputes concerning Labor Standards, and Certification of Eligibility* in any lower tire subcontract.

(n)    Partnering. Subcontractor, at Contractor's request, agrees that a corporate representative or officer of the Subcontractor will be made available to attend partnering sessions with the Owner to facilitate project communication and cooperation.

(o)    Systems. The Subcontractor represents and warrants that any system, process or equipment that contains any software or firmware provided under this Subcontract shall:

    i.    be able to accurately process date and time data (including calculating, comparing, and sequencing) from, into, between, and among (i) all centuries including the twentieth and twenty-first centuries, (ii) all calendar years including the years 1999 and 2000, and (iii) and all leap years;

    ii.    be able to perform such calculations and properly exchange date and time data when used in combination with any system, process or equipment being acquired for the Project from third parties, and

    iii.    be able to perform such calculations and properly exchange date and time data when used in combination with any system, process or equipment currently existing on the project.

The duration of this warranty and the remedies available to the contractor for breach of this warranty shall be as defined in the general warranty provisions of this Subcontract, provided that notwithstanding any provision to the contrary in such warranty provisions, or in the absence of any such warranty provisions, the remedies available to the contractor under this warranty shall include, at no cost to the Contractor, repair or replacement of any listed item whose non-compliance is discovered and made known to the Subcontractor.

Nothing in this Article shall be construed to limit any rights or remedies the Contractor may otherwise

FOR THE PROJECT KNOWN AS:

GSA Federal Building, San Francisco
Subcontract Number 21058-129
GSA Contract No. GS-09P-02-KTC-0002
GSA Project No. NCA00049
COST CODE:  099000

21 of 23

have under this Subcontract.

(p)    The Contractor's failure to exercise any right hereunder or to insist upon the performance of any of the terms, covenants or conditions of the Subcontract shall not be construed as a waiver or relinquishment of the requirement for future performance of such covenants or conditions by Subcontractor. All obligations of Subcontractor with respect to future performance shall continue in full force and effect.

THIRTY-SIXTH.    Assignment.
The Subcontractor will not sell, assign, sublet, transfer, or set over this Subcontract or any part thereof or interest therein or assign any monies due hereunder without the written consent of the Contractor. Any part of the work provided for herein which may be sublet by the Subcontractor shall be by written agreement only, upon the same form of agreement as this Subcontract, and shall be approved by the Contractor and shall expressly provide that the work so sublet shall be performed strictly in accordance with and governed by all contract conditions applying to this Subcontract Agreement and the General Contract. Copies of all subcontract agreements and purchase orders issued by Subcontractor shall be provided to the Contractor upon their issuance.

THIRTY-SEVENTH.    Severability.
If any one or more of the provisions contained in this Subcontract, for any reason, are held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision hereof, and this Subcontract shall be construed as if such invalid, illegal, or unenforceable provision had never been contained herein.

THIRTY-EIGHTH.    Choice of Law and Disputes.
(a) The performance of this Subcontract and all of its terms and conditions, as well as any arbitration or judicial proceeding, shall be interpreted and governed by the laws of the State of California.

(b) Subcontractor agrees that any dispute of any kind, nature or description or any controversy or claim arising out of or relating to this Subcontract or the breach thereof may, at the mutual agreed upon election of the parties, be settled by non-binding mediation or by binding arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association. In any such arbitration, full discovery will be allowed as described in the Federal Rules of Civil Procedure, and any remedy or relief granted by the arbitrator(s) shall be in accordance with the terms of this Subcontract as interpreted under and governed by the laws of the jurisdiction identified in paragraph (a), above. In any such arbitration, the arbitrator(s) shall not be empowered or authorized to add to, subtract from, delete or in any other way modify the terms of this subcontract. If arbitration is so elected by the Contractor, then judgment upon the award rendered by the arbitrator(s) may be entered in any Court having jurisdiction thereof. If the Contractor elects to proceed by arbitration, the venue of such proceeding shall be the project area.

(c) Contractor shall have the right to elect to proceed to non-binding mediation or binding arbitration, as described in paragraph (b) above, at any time prior to the commencement of a judicial proceeding by the Contractor, or in the event a judicial proceeding is instituted by the Subcontractor, at any time prior to the last day to answer and/or appear to a Summons and/or Complaint of the Subcontractor.

(d) If the Owner and the Contractor, pursuant to the General Contract or by agreement, submit any dispute, controversy, or claim between them to arbitration or some other disputes resolution procedure specified in the General Contract and such a matter involves or relates to a dispute, controversy, or claim between the Contractor and the Subcontractor, Subcontractor agrees (i) to join in and be bound by the same arbitration or other disputes resolution procedure upon written request by the Contractor and (ii) to stay any action filed by the Subcontractor until the dispute resolution and appeals process between the Contractor and the Owner is exhausted. If the Owner refuses to allow this joinder of the Subcontractor, Subcontractor agrees (i) to cooperate with the Contractor, (ii) to assist in the discovery and other preparations for the hearing, (iii) to make available its employees for testimony before or at the hearing, (iv) to share proportionately the costs and legal fees associated with the preparation for and execution of the hearing, (v) to stay any action filed by the Subcontractor until the dispute resolution and appeals process between the Contractor and the Owner is exhausted, and (vi) to be bound by the results of the arbitration or other disputes resolution procedure as it relates to the dispute, controversy, or claim of the subcontractor.

(e) To the extent that any dispute, controversy, or claim arises hereunder and a suit is instituted, it shall be brought in and before the State or Federal Court of the project location wherein exclusive jurisdiction shall lie. Notwithstanding the above, if the Owner is joined by the Contractor in any such suit, Subcontractor hereby stipulates that it shall agree to move the suit to the venue of the project site and/or to the disputes resolution forum specified in the General Contract upon the request or motion of the Contractor.

(f) Subcontractor shall insert a provision identical to this Article Thirty-Eighth into all of its sub-subcontracts for the project. Nothing in this section shall be deemed to waive, alter or modify any

FOR THE PROJECT KNOWN AS:

GSA Federal Building, San Francisco
Subcontract Number 21058-129
GSA Contract No. GS-09P-02-KTC-0002
GSA Project No. NCA00049
COST CODE: 099000

22 of 23

condition precedent to suit contained in any other provision of the Subcontract or to give the sub-subcontractors any contractual privity with or rights against the Contractor.

(g) No action or proceeding shall lie or shall be maintained by Subcontractor against the Contractor unless such action shall be commenced within one (1) year after the date payment is mailed or otherwise made in respect of the Final Application for Payment or, if this Subcontractor or performance under this Subcontract is terminated by the Contractor, unless such action or proceeding is commenced within one (1) year after the date of such termination.

THIRTY-NINTH.    Headings.
The headings inserted in this Subcontract Agreement are for convenience only and shall in no way affect the interpretation of this Agreement.

FORTIETH.    Owner Approval, Succession of Interests and Modification.
It is understood and agreed that the Owner has the right to approve or disapprove the employment of this Subcontractor and in the event that the Owner does not execute the General Contract with the Contractor or does not approve this Subcontract, this Subcontract shall become null and void. This Agreement shall be binding upon and inure to the benefit of the respective heirs, executors, administrators, successors, and permitted assigns of the parties hereto, but no third party benefits are created by this Subcontract and no modification of this Agreement shall be binding upon the Contractor unless such modification is in writing and signed by the Contractor.

FORTY-FIRST. California License
California law requires that contractors and Subcontractors be licensed and regulated by the Contractors' State License Board which has jurisdiction to investigate complaints against contractors and subcontractors if a complaint regarding a latent act or omission is filed within four (4) years of the date of the alleged violation.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement the day and year first hereinabove written.

Witness: _Jessica Ybarra_
        Jessica Ybarra

Subcontractor
George E. Masker, Inc.
By _____
Representative of Subcontractor Authorized to Execute Subcontract
Title: _Alan A. Bjerke   President_
Date: _10/2/03_

Witness: _____

Contractor
Dick / Morganti Joint Venture
By _____
Title: _____ Project Mgr.
Date: _10-06-03_

FOR THE PROJECT KNOWN AS:

GSA Federal Building, San Francisco
Subcontract Number 21058-129
GSA Contract No. GS-09P-02-KTC-0002
GSA Project No. NCA00049
COST CODE:   059000

23 of 23

5. The work scope included in this Change Order shall be completed no later than the completion dates as specified in the Contract, unless specifically allowed by this Change Order.

TOTAL OF CHANGE ORDER: No. 00011     ADD